The HILLHAVEN CORPORATION

v.

Richard S. SCHWEIKER.

Civ. A. No. 82–730–A.

United States District Court,
M.D. Louisiana.

July 15, 1983.

J. David Garrett, Blanchard, Walker, O'Quinn & Roberts, Shreveport, La., for plaintiff.

Shelly C. Zwick, Asst. U.S. Atty., M.D. La., Baton Rouge, La., Dennis S. Diaz, Atty., Dept. of Health & Human Services, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOHN V. PARKER, Chief Judge.

This litigation arises from the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq. (1976), which declares the congressional intent to provide essential medical care for the elderly and the disabled. The Act has spawned brigades of bureaucrats, gaggles of administrative regulations, an additional vocabulary of acronyms (e.g. "HIM"—not a pronoun indicating a male, but a "Health Insurance Manual") and substantial administrative decision making and litigation in federal courts, for which, in turn, a new reporter, "Medicare and Medicaid Guide" (Commerce Clearing House) has blossomed, a publication which has not yet made its way to this court's library. This benevolent legislation has also caused the Secretary of Health & Human Resources to begin regulation of the accounting practices of "providers" and to engage "fiscal intermediaries" for that purpose and a section of the Act, 42 U.S.C. § 1395oo, establishes a "Provider Reimbursement Review Board" (affectionately known to "providers" and "fiscal intermediaries" alike as "PRRB") for the purpose of resolving disputes between them. Decisions rendered by this review board are final unless the Secretary modifies the decision within 60 days (he did not do so here), failing which the disgruntled "provider" is authorized to institute an action in the nearest federal district court. 42 U.S.C. § 1395oo(f).

Plaintiff is such a disgruntled provider (technically plaintiff is the successor to the Merit Corporation which was a provider). Plaintiff is disgruntled because the decision of the Provider Reimbursement Review Board will cost it money, $92,811.00, if allowed to stand. Naturally, plaintiff considers the administrative decision arbitrary and capricious, while defendant suggests that the decision is the epitome of reason and logic. It is the court's duty, by act of the Congress, to decide which is correct.

The administrative record upon which the decision was based has been filed in this record and the facts are undisputed. Each side claims that the undisputed facts show unmistakably that he is entitled to judgment in his favor as a matter of law. Each has filed a motion for summary judgment under Rule 56, Fed.R.Civ.P. The motions have been orally argued and submitted upon multiple, lengthy briefs, which have exhaustively explored the issues and which cite virtually all legal authorities, save the Code of Hammurabi.

A few more statutory and administrative references are necessary in order to fully set the stage. Providers such as plaintiff, supply hospital type services under contractual arrangements with the Secretary and the Act authorizes reimbursement to providers for "the reasonable costs" of such services, 42 U.S.C. § 1395x(v)(1)(A), which the Congress has defined as "the cost actually incurred, excluding therefrom any part of the incurred costs found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C.

§ 1395x(v)(1)(A). In order to more fully explain what the Congress intended by this statute, the Secretary (as he was authorized to do, 42 U.S.C. § 1395hh) has promulgated a plethora of regulations. 42 C.F.R. §§ 405.401 et seq. In order to more fully explain what the Secretary intended the regulations to mean, he has also issued at least fifteen health insurance manuals (the ubiquitous "HIM"). The authority to issue health insurance manuals is obscure—at least neither side has cited any authority, although both sides freely make reference to "HIM."

This dispute involves reasonable allowance for depreciation. The Secretary recognizes that depreciation of assets used in providing medical services is a proper cost of providing such services and he therefore authorizes reimbursement for that cost to the providers. The Secretary has also adopted the sensible position that if a provider who has been reimbursed for depreciation of an asset transfers the asset to another for a price exceeding the depreciated "value" of the asset, then the Secretary ought to get the depreciation money back. The Secretary has determined, however, that if a provider who gets out of the provider business keeps the depreciated asset for at least a year before transferring it, then there will be no recapture of depreciation. 42 C.F.R. 405.415(f). Thus, if the provider makes a profit on the transfer of a depreciated asset which covers the previously allowed depreciation, he does not have to pay the depreciation back to the Secretary if the transfer occurs more than one year after he gets out of the provider business. It is that regulation with its explanatory "HIM," which is the nub of the problem before us. The Secretary was not very precise when he promulgated his regulations. The existence of the one year rule encourages providers who are offered a good profit for their assets to figure creative ways to hold the assets for a year after getting out of the Medicare program but still get the good price. If successful, the former provider gets to keep the depreciation for which he has already been reimbursed by the Secretary, and the good price

as well. In promulgating the regulation the Secretary probably failed to take into account this old American tradition of making a dollar whenever possible. Providers who plan to sell high will inevitably devise schemes to get the profit but avoid the repayment of the allowed depreciation. The question here is whether plaintiff's scheme is to be successful.

Merit was a qualified provider which owned and operated a nursing home facility in Baton Rouge, Louisiana. Merit apparently received a favorable offer from the Baton Rouge General Hospital and the parties entered into two contracts: a lease and a contract to sell, both dated July 14, 1977. On that same date Merit ceased participation in the Medicare program as a provider. The lease covered substantially all assets of the nursing home, movable and immovable. The term of the lease was one year and two days. Baton Rouge General Hospital agreed to operate the facility as a hospital or nursing home and agreed to pay the rental of $227,328.00 in monthly installments of $18,944.00. The lease contained the other customary clauses, relating to insurance, taxes, indemnity and so forth. In the contract to sell, Merit agreed to sell the facility to Baton Rouge General Hospital for a price of $1,740,000.00, the sale to be passed at 7:00 A.M. on July 18, 1978, or any subsequent date agreeable to the parties. The buyer paid $1,000.00 as a deposit, but it was stipulated in the agreement that the deposit was not to be considered as earnest money and the right to specific performance was reserved.

After the passage of a year and several days (the record is not specific as to the precise date that the sale was passed, but it is undisputed that it was shortly after the year was up), Merit executed a formal sale of the property and received the purchase price from Baton Rouge General Hospital.

Enter the "fiscal intermediary."

As a provider, Merit was required to submit claims for reimbursement to Aetna Life & Casualty Co. which was serving as the Secretary's "fiscal intermediary." Aetna

examined the papers and determined that Merit had received such a good price for the facility that the depreciation previously reimbursed should be "recaptured" by setting off $92,811.00 against Merit's other claims for reimbursement of costs. That determination is predicated upon the view that the actual transfer (the Secretary refers to it as "disposal") occurred July 14, 1977, when the lease and contract to sell were executed, not when the sale papers were signed a year later. Merit appealed the decision of the "fiscal intermediary" to the review board which affirmed and the Secretary declined to modify the board's action. This suit followed under the authority of 42 U.S.C. § 1395oo(f).

The Congress has granted the Secretary plenary authority to "prescribe such regulations as may be necessary to carry out the administration" of the Medicare program. 42 U.S.C. § 1395hh. Doubtless, then, the Secretary, if he deems it necessary, has full authority to prescribe a regulation that provides for recapture of depreciation previously allowed in transactions such as that before us. The question is, has he done so? In order to resolve that issue we must examine the regulation, 42 C.F.R. 405.415(f), which refers to "disposal" of assets:

(f) *Gains and losses on disposal of assets* —

(1) *General.* Depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty. If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost shall be limited to the amount of depreciation previously included in Medicare allowable costs . . .

Subsection 2 of the regulation declares that gains and losses upon sale of assets will be recognized only if the sale occurs while the provider is still in the Medicare program except that subsection 3 prescribes the one year rule, to which reference has already been made.

The Secretary argues that he has explained what the regulation is trying to say by issuing a health insurance manual, cited authoritively as "HIM–15." The pertinent appendages of "HIM–15" provide:

130. DISPOSAL OF ASSETS

Depreciable assets may be disposed of through sale, trade-in, scrapping, exchange, theft, wrecking, fire or other casualty. In such cases, depreciation can no longer be taken on the asset, and gain or loss on the disposition must be computed.

Section 132 of the Secretary's "HIM–15" repeats the one year rule, noting that depreciation will be recaptured where a provider, "ceases to participate in the program and subsequently *disposes of* its depreciable assets within 1 year . . . "

The Secretary places great emphasis upon the use of the words "disposes of" quoted above and argues that his "HIM" covers any "disposal" of assets, regardless of form and that a one year lease coupled with a contract to sell one year later so amounts to a "disposal" as to be considered a sale. The Secretary also argues that since the court is reviewing the action of an administrative agency, it is bound by the "substantial evidence" rule and that there is substantial evidence to support the decision. 5 U.S.C. § 706; see *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

Plaintiff argues that the regulation is not to be read so broadly, that "disposal" is limited to those transactions specifically listed by the Secretary in subsection (f)(1), above and "HIM–15," section 130 above. Since lease and contract to sell are not included as types of "disposal," plaintiff argues that the transactions it entered comply with the regulation and that it is entitled to its $92,811.00. Further, says plaintiff, there is no substantial evidence rule because we have here a question of law, not fact, which the court is better equipped to decide than the agency. Finally, plaintiff says that the Secretary has taken a position here contrary to that taken in other cases and that he ought to be estopped from taking a different stand. Plaintiff also

cites another portion of the Secretary's "HIM–15," relating to leases, which it says resolves the issue in its favor.

As to the claim of contradictory positions taken by the Secretary, an examination of the cases discloses that the Secretary has consistently attempted to protect the public fisc. The Secretary has had mixed results in court. *American Medicorp, Inc. v. Schweiker,* 690 F.2d 750 (9th Cir.1982) was a case in which the Secretary was dealing with the other end of transactions such as this. There the *buyer* was requesting that the Secretary recognize him as the real owner and reimburse him for depreciation at the stepped up valuation of the depreciable assets despite the fact that his legal title was imperfect. There the Secretary took the position that no transfer ought to be recognized until legal title was delivered to the purchaser. The court saw otherwise. In *Pacific Coast Medical Enterprise v. Harris,* 633 F.2d 123 (9th Cir.1980), *Memorial, Inc. v. Harris,* 655 F.2d 905 (9th Cir.1980), *Chateau Gardens, Inc. v. Harris,* 497 F.Supp. 133 (E.D.Mich.1980), *American Medicorp, Inc. v. Schweiker,* supra, and *West Seattle General Hospital, Inc. v. United States,* 674 F.2d 899 (Ct.Cl.1982), the court recognized what it termed "equitable title" and ordered the Secretary to reimburse the claimant for accelerated depreciation and good will, while in *Richey Manor, Inc. v. Schweiker,* 684 F.2d 130 (D.C.Cir. 1982), *Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201 (5th Cir.1980), *Monterey Life Systems, Inc. v. United States,* 635 F.2d 821 (Ct.Cl.1980) and *American International, Inc. v. Secretary,* 466 F.Supp. 605 (Dist.D.C. 1979) aff'd, 677 F.2d 118 (D.C.Cir.1981), the court declined to recognize the change in ownership and the stepped up basis for depreciation. Plaintiff points out that the Secretary is now urging recognition of equitable title" after repeatedly insisting to other courts that only legal title should control.

Each of those cases dealt with transfers of the shares of stock of the selling corporation and some also involved corporate mergers or other such transactions. None involved the lease-contract to sell situation that we have here and in each case the Secretary's position was that he did not want to recognize the stepped up evaluation of the asset (which meant, of course, that Medicare would pay twice for depreciating the same asset).

We can dispose of the estoppel claim quickly. The Secretary's position here, although facially inconsistent with prior positions, does not give rise to estoppel. His position in each case, including this one, has been to attempt to protect the treasury. In the absence of affirmative misconduct, estoppel cannot be interposed to government action when a public official acts to enforce public policy as enacted by the Congress. *I.N.S. v. Miranda,* —— U.S. ——, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982); *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981). Here the Secretary's activities are to be commended, not condemned, and there is clearly no estoppel.

The prior cases, while interesting, do not resolve our dispute because of the totally different factual circumstances and the different regulation involved.

*Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201 (5th Cir.1980) is typical of the cited cases. There a corporation bought all the shares of stock of the provider corporation. The price paid reflected the value of all corporate assets. The buying corporation continued to operate the health care facility through its new subsidiary and when the cost papers were submitted for reimbursement purposes, the buyer valued the assets at the sale price of the stock of the subsidiary corporation. The Secretary held that there had been no transfer of assets and recognized only the depreciated value of the assets before the transfer of the stock. The provider invited the court to pierce its own corporate veil, urging the court to not "exalt form over substance." The court pointed out that the plaintiff voluntarily chose to operate in the corporate form and declined to choose substance over form, noting, "for the regulation to cut through or ignore that mass of established corporate law upon which the Secretary relied would require at

the very least a clear intention, a compelling case." Id. at 1208. It is the Secretary who now urges that we look to the "substance of the transaction" rather than mere form and asks that we depart from a large body of established property law.

▪ The courts properly grant great deference to decisions of administrative bodies in the area of their expertise. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Sierra Club v. Sigler,* 695 F.2d 957 (5th Cir.1983). But where the issues are not factual or technical and relate merely to the construction or interpretation of a law or regulation, the courts do not hesitate to substitute the judicial for the administrative opinion. *Coca-Cola Co. v. Atchinson, T. and S.F. Ry. Co.,* 608 F.2d 213 (5th Cir.1979). Thus, the Secretary's decision here comes before the court in a neutral posture with no presumption of correctness.

Although no evidence was offered on the point, I assume that plaintiff structured the transaction for the purpose of avoiding repayment of depreciation previously allowed. The Secretary, no doubt anticipating that he will be called upon to reimburse the new owner, Baton Rouge General Hospital, for depreciation based on the stepped up valuation, seeks to recapture the depreciation already paid to Merit.

▪ The questioned transactions occurred in Louisiana and the legal relations of the parties are governed by Louisiana law. *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). Louisiana property law, despite the Secretary's attempt to argue to the contrary, is clear that a promise to sell and a sale are not the same. Article 2462 of the Louisiana Civil Code provides in part:

A promise to sell, when there exists the reciprocal consent of both parties as to the thing, the price and terms, and which, if it relates to immovables, is in writing, so far amounts to a sale, as to give either party the right to enforce specific performance of same.

Louisiana case law is long and uniform to the effect that a contract to sell at a future time is not a sale and does not transfer ownership and that the property remains at the risk of the seller until the actual sale occurs. *Foreman v. Saxon,* 30 La.Ann. 1117 (1878); *Breaux v. Burkenstock,* 165 La. 266, 115 So. 482 (1928); *Gibsland Supply Co. v. American Employees Insurance Co.,* 242 So.2d 310 (La.App. 2d Cir.1970) writ den. 257 La. 987, 244 So.2d 858 (1971); see also *Litvinoff, Of The Promise of Sale and Contract to Sell,* 34 La.Law Review 1017.

▪ Under Louisiana law title to the property did not pass from Merit until more than a year after it terminated its participation in the Medicare program. The government argues that it should nevertheless be considered as a "disposal" of the asset for purposes of the regulation, 42 C.F.R. 405.415(f) quoted above, contending that "disposal" is a broader term than "sale" and should include leases coupled with contracts to sell, because the Baton Rouge General Hospital came into possession and control of the property on July 14, 1977. The difficulty with that reasoning is that, although the hospital did come into possession and control of the assets on that date, it did so under the terms of a written lease which acknowledges Merit as owner and under Louisiana law, the hospital possessed only as lessee, obliged to possess as a good administrator and pay the rent when due, (La.Civ.C. Art. 2710) under the penalty of being expelled if it did not pay timely (La.Civ.Co. Art. 2712) and under the further obligation of returning the assets at the termination of the lease (La.Civ.C. Arts. 2719, 2720). It did not possess as owner.

The Secretary's primary reliance for his position is upon the last portion of Section 132 of his "HIM–15," quoted above, providing that gains or losses on depreciation of depreciable assets will be recognized where a provider, "disposes of its depreciable assets within 1 year after" leaving the program. The Secretary argues that this phrase shows that, although the regulation says, "disposed of through sale, scrapping, trade-in, exchange, demolition, abandon-

ment, condemnation, fire, theft or other casualty," [42 C.F.R. 405.415(f)] the term "disposed of" is not to be limited to the specific types of disposal recited in the regulation. The Secretary further argues that Merit "disposed of" this facility on July 14, 1977, even if it did not technically transfer title. The Secretary presses for a recognition of some sort of "equitable title" in Baton Rouge General Hospital.

The Secretary's argument is unconvincing. The clear, established principles of Louisiana law are that Merit remained the owner of the property until the actual sale was passed more than a year after it got out of the "provider" business. Without commenting upon the questionable origin of the "HIM," and simply observing that the "HIM" could not contradict the duly adopted regulation, assuming that it can "explain" it, the very HIM upon which the Secretary relies to explain the regulation is restricted to the same list of types of disposal as the regulation itself. Section 130 of the "HIM" recites "sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft or other casualty." That list is comprehensive; it covers every form of disposal of *ownership* except donation. The disposal regulation even as explained by the "HIM" simply does not reach this transaction. All the types of disposal listed in either the regulation or the HIM relate to transfers of *ownership*. While the Secretary is free to create a doctrine of "equitable title" by regulation for purposes of recapturing depreciation under the Medicare program, that doctrine must be spelled out in the regulation. This regulation as written gives no hint that the Secretary will not grant to contracts legally entered into the same effect which the law of the state where they were confected gives to them.

The Secretary's zeal in protecting the treasury is commendable but, despite the cost to the Medicare program, the court concludes that the administrative decision is erroneous. The regulations need to be amended if the Secretary considers it necessary to recapture depreciation in transactions of this nature. As noted, the Con-

gress has granted him full authority to place substance over form by regulation, if that is necessary, 42 U.S.C. § 1395hh, but he simply has not done so.

For the reasons stated herein, there will be judgment denying the motion for summary judgment on behalf of the Secretary and granting the motion for summary judgment on behalf of plaintiff.