ITT INDUSTRIAL CREDIT COMPANY

v.

The M/V RICHARD C, et al.

No. 83–655.

United States District Court,
E.D. Louisiana.

Sept. 13, 1985.

Adams & Reese, John M. Duck, Liskow & Lewis, William W. Pugh, Charles M. Steen, New Orleans, La., for Smatco, Inc.

A.J. Schmitt Jr., Schmitt & Mathes, New Orleans, La., David J. Balduf, Biloxi, Miss., for Kennedy Engine Co. Inc.

Jackson & Stovall, James E. Stovall, New Orleans, La., for Lombas Industries, Inc.

## OPINION

ARCENEAUX, District Judge.

Plaintiff, ITT Industrial Credit Company ("ITT"), instituted this suit in admiralty to foreclose on an alleged Preferred Ship Mortgage on the M/V RICHARD C, which mortgage allegedly secures the payment and performance of a promissory note in the original principal amount of $900,-000.00, executed by defendant Leonard J. Camaille ("Camaille") and guaranteed by defendant Gulf Outlet Marine Services, Inc., ("GOMS"). The *in rem* defendant, the M/V RICHARD C, was seized on February 12, 1983. Kennedy Engine Company, Inc. ("Kennedy") and Smatco, Inc. ("Smatco") subsequently intervened and have claimed maritime liens for the sale and delivery of a winch and engine package to the vessel. Lombas Industries, Inc. ("Lombas") has intervened and claimed a maritime lien for charter hire advances paid for the future use of the vessel, which use was denied due to the vessel's seizure in this matter; Lombas also had claimed *in custodia legis* expenses for wharfage for the vessel after her seizure.

Defendants Camaille and GOMS subsequently filed petitions in bankruptcy, and all *in personam* proceedings against them were stayed. However, the stay was lifted as it pertains to the litigation foreclosing on the M/V RICHARD C. A trial before the Court without a jury was held on January 21 and 23, 1985, and the matter was taken under submission. Having considered the evidence adduced at trial, the memoranda of counsel and the law, the Court now issues its opinion.

## BACKGROUND

The factual background relevant to issues presented in this lawsuit is largely undisputed. The M/V RICHARD C was constructed in Slidell, Louisiana by GOMS, a corporation solely owned by Camaille, who also served as its president. Construction began in 1980, and GOMS was the owner of the vessel under construction, designated as "Hull No. 6," until some time in 1982.[1] Interim financing for the construction was arranged through Jefferson Bank & Trust ("JBT") by GOMS. (Exh. P–15 to P–16).

GOMS contracted with Kennedy for the sale of an engine and generator package, which was delivered to the GOMS shipyard between February 1, 1982, and October 27, 1982, and installed onto the M/V RICHARD C by GOMS at some undetermined

---

**1.** Although vessel status is in issue, the Court will refer to the *vessel in its various* stages of completion as the M/V RICHARD C.

time during that period (Exh. K–1 to K–17; PTO p. 15). The Smatco winch bought by GOMS was delivered to the shipyard on June 23, 1982, and installed onto the M/V RICHARD C by GOMS at some time between June 23, 1982, and August 11, 1982. (Exh. S–1 to S–7; PTO p. 14–15).

On December 2, 1982, Lombas entered into a contract with Camaille for the bareboat charter of the M/V RICHARD C. (Exh. ITT–45). The vessel was moved from the GOMS shipyard in Slidell, Louisiana to the Lombas dock in Larose, Louisiana on December 17, 1982. (Dep. Puglisi and Bonham, p. 82). The vessel remained at the Larose facility following her seizure on February 12, 1983, to July 26, 1983, when a consent keeper was appointed and she was moved to another location. (Exh. ITT–49 to ITT–50; Exh. L–4 to L–7).

As it relates to the ITT note and mortgage, it is undisputed that Camaille swore out a Master Carpenter's Certificate with the United States Coast Guard ("Coast Guard") on June 14, 1982, indicating that he was the Master Carpenter of the vessel and that the M/V RICHARD C was built for him. (Exh. ITT–13). It is likewise stipulated that on September 15, 1982, Camaille signed mortgage papers prepared by ITT's attorneys which included a written representation that Camaille was the sole owner of the M/V RICHARD C, and that the vessel was free and clear of all liens and encumbrances. That mortgage was recorded and documented with the Coast Guard on the same day. (Exh. ITT–1 to ITT–7; ITT–14). A corporate resolution authorizing the GOMS guarantee of the note was also drafted by ITT's attorneys and executed on that date. (Exh. ITT–8 to ITT–9).

The factual dispute presented is basic, for although intervenors have also advanced individualized theories seeking respective priming ranks for their liens, they principally attack the very validity of the ITT mortgage. Ownership of the vessel at relevant times, including when the mortgage and note were executed, is at the focus of the dispute, and "vessel" status at pertinent times is also at issue. Although further complicated by evidentiary deficiency, the root of all dispute is directly traceable to the parties' misplaced reliance on the word and reputation of defendant Camaille, which has seriously distorted what would otherwise have been routine collection postures.

## THE MAN

Prior to the trial in this matter, Camaille pleaded guilty to conspiracy to make false material statements to two federally insured banks for the purpose of influencing loan decisions, and was sentenced to a 15 month prison term. His wife, Rita Samrow Camaille, was also indicted, but pleaded guilty to a bill of information charging her with relieving, receiving, comforting and assisting Camaille in order to hinder and prevent his apprehension; she received a suspended 12 month sentence. The scheme in which the two were charged involved $1,200,000.00 worth of loans sought and made between March 1, 1982, and September 30, 1983, on a non-existent vessel. *United States v. Camaille, et al,* No. 84–179 "H" (E.D.La.).

Camaille's testimony demeanor at trial was relaxed; he openly admitted signing whatever papers were required in order to obtain the ITT loan without regard to their truth. He openly admitted that he felt that GOMS and himself were one and the same, that, as a result, he felt he owned the vessel through GOMS, from the beginning, and that no written act of sale was passed nor was a corporate resolution adopted authorizing a transfer of ownership of the M/V RICHARD C from GOMS to himself. At trial, he testified (as both parties to the sale) that he felt the sale occurred on September 20, 1982, when the interim financing on the hull was paid, and some five days after the ITT note and mortgage were executed. His testimony, the only testimony on the issue of ownership, indicates he did not own the M/V RICHARD C on September 15, 1982, despite his written representations to the contrary. This Court is called upon to determine the serious ramifi-

cations of this testimony when applied to the law.

### OWNERSHIP

ITT's only witness at trial, George Werner, dealt with Camaille in setting up the loan. (Exh. S–9). He stated that he knew that Camaille treated GOMS and himself as one and the same. When he met with Camaille in August, 1982, he knew the M/V RICHARD C belonged to GOMS, and did not make inquiry into how or when the vessel was to be sold to Camaille individually. Werner understood that Camaille's purpose in obtaining the loan was to purchase the M/V RICHARD C at some future date; Werner knew that Camaille had purchased other vessels from the company in the past. Werner relied solely on what Camaille told him about his intent to transfer, and recognized that the sale itself should be accomplished before the financing was completed. Werner did not testify as to the alleged sale itself; his testimony is only relevant to a possible agreement to buy and sell.

While the evidence reflects inconsistency and confusion regarding ownership at any given time, it also shows that ITT had knowledge of other documents dated just prior to the execution of the ITT mortgage and note, which indicated that GOMS owned the M/V RICHARD C, contrary to any representation set forth in the June 14, 1982, Master Carpenter's Certificate. ITT's Commitment Letter, dated September 8, 1982, reflected the ownership of GOMS, as did the Condition and Valuation Survey performed at the request of GOMS, dated August 12, 1982. (Exh. ITT–10, ITT–12). In addition, the the JBT collateral ship mortgage and note, dated August 31, 1982, reflected the ownership of GOMS. (Exh. ITT–15). The Declaration of Officer of Incorporated Company, executed simultaneously with the mortgage and note on September 15, 1982, identified the M/V RICHARD C with perhaps an over-stated but revealing reference to the "Master Carpenter's Certificate of Leonard J. Camaille, *of Gulf Outlet Marine Services, Inc.*, dat-

ed June 14, 1982." (Exh. ITT–2) (Emphasis added).

In sum, ITT went to the closing on September 15, 1982, with the specific knowledge that Camaille openly ignored any formal distinction between GOMS and himself, and that the sale of the M/V RICHARD C *should* occur prior to the completion of the ITT financing. However, the only proof required by ITT of a change in ownership status, and of a sale between GOMS and its sole owner, (other than the June 14, 1982, Master Carpenter's Certificate) was a written representation contained in the mortgage prepared by ITT's attorneys. (Exh. ITT–2). The Affidavit as to Good Faith does not specify that Camaille owned the M/V Richard C, but that the mortgage was made in good faith and without any design to hinder, delay or defraud existing or future creditors or lienors. (Exh. ITT–2). According to the testimony of both Werner and Camaille, no verbal inquiry or verbal representation that Camaille owned the vessel was made at the September 15, 1982, closing.

While the issue of ownership does not affect the viability of the promissory note, or the existence of the debt owed by Camaille and guaranteed by GOMS, it does affect the right of ITT to proceed against the vessel as security for the debt, under 46 U.S.C. § 911 *et seq.* Preferred status under 46 U.S.C. § 953 requires that the mortgage first be a valid one. *Chemical Bank New York Trust Co. v. Steamship Westhampton,* 358 F.2d 574 (4th Cir.1965), *cert. denied* 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1966). Merely following the correct recording procedures set forth in the statute do not convert an invalid mortgage into a valid preferred ship mortgage. *Bergren v. Davis,* 287 F.Supp. 52 (D.Conn. 1968). It is further obvious that a mortgage cannot attach to property not owned by the mortgagor; indeed, no such argument is being made in this matter.

The ownership of a vessel is not dependent on its registration. *Southern Bell Telephone & Telegraph Co. v. Burke,* 62 F.2d 1015 (5th Cir.1933). A Certificate

of Documentation is not conclusive evidence of ownership in a proceeding in which ownership is in issue. *46 U.S.C. § 12104 (formerly 46 U.S.C. § 65(g))*. Rather, the question of ownership of a vessel is governed by state law; where that ownership is derived by virtue of a sale, the requirements for a contract of sale are likewise determined under state law. *St. Paul Fire & Marine Insurance Co. v. Vest Transportation Co., Inc.*, 666 F.2d 932 (5th Cir.1982); *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160 (5th Cir.1979), *cert. denied* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980).

■ ITT bears the burden of establishing Camaille's ownership of the M/V RICHARD C as part of its burden in establishing preferred status. A party alleging the existence, nullity, modification or extinction of an obligation must prove his allegation by a preponderance of the evidence under Louisiana law. La.Civ.Code art. 1831 (formerly La.Civ.Code art. 2232). A sale in Louisiana is considered perfect between the parties when there exists consent as to the object and the price. La.Civ. Code arts. 2439, 2456. However, an agreement to buy and sell, where the parties are looking forward to a sale, is not a sale as it does not transfer ownership. La.Civ.Code art. 2462; *First Federal Savings & Loan Assn. of Alexandria v. Botello*, 725 F.2d 350 (5th Cir.1984); *Hillhaven v. Schweiker*, 570 F.Supp. 248 (M.D.La.1983).

Louisiana corporations are intellectual beings different and distinct from the persons who comprise them; corporate property does not belong to those persons. La. Civ.Code arts. 435, 436. Moreover, to all contracts there must be at least two persons; a person cannot contract with himself. La.Civ.Code art. 1906 (formerly La. Civ.Code art. 1765).

Under Louisiana law, a contract of sale for a movable can be either written or verbal.[2] La.Civ.Code art. 2441. While the parties emphasize the lack of a written act of sale in the matter *sub judice,* no evidence of a verbal sale exists. Camaille represented ownership in the M/V RICHARD C in both the corporation and himself interchangeably and sporadically, but at no time did the alleged sale manifest itself in either written or verbal form. Camaille did not buy the vessel, he merely "claimed" ownership whenever convenient.

Moreover, the existence of a verbal sale has not been sufficiently proven. Under Louisiana law, where the value of the movable exceeds $500.00, proof of a verbal contract of sale must be made by testimony of one witness and other corroborating circumstances. La.Civ.Code art. 1846 (formerly La.Civ.Code art. 2277). The testimony of Camaille in this regard cannot be given credit by the Court in light of his history of inconsistent statements relative to ownership, his refusal to distinguish between the corporation and himself, and his confessed ability to defraud banks in highly creative and deceptive manners, using a highly developed understanding of the origin of documents relied upon by lenders which are not otherwise verified. Therefore, at best, the credible evidence suggest that a non-written, non-verbal agreement to buy and sell involving parties which considered themselves one, may have existed at some time prior to the execution of the mortgage and note; it does not approach proving a sale of the vessel at any time. This conclusion is further supported by circumstances surrounding the alleged down payment on the M/V RICHARD C, since credit for monies owed to Camaille by GOMS was specifically forbidden under the ITT mortgage.

Argument regarding after-acquired property under La.Civ.Code art. 3304 or otherwise must necessarily fail not only because no sale has been proven, but also because the applicable federal regulation states that

---

2. The Court notes, however, that the requirement that sale of vessels under the Ship Mortgage Act be reduced to writing could be inferred from the explicit statutory requirement that such bills of sale and conveyances be recorded.

46 U.S.C. § 921, § 926. Further, the Court could not find a single reported case under the Ship Mortgage Act where a written act of sale was not executed.

a ship mortgage is not eligible for indexing and endorsement as a preferred mortgage if the mortgagor did not hold legal title to the subject vessel at the time of the execution and recordation of the mortgage. 46 C.F.R. 67.37–5(c). In short, ITT is unable to prove a security interest in the M/V RICHARD C *at any time* due to the lack of proof of a sale, and is additionally unable to prove preferred status since proof of a sale *at the time* of the execution and recordation is lacking.[3]

ITT has virtually ignored the problem of ownership in its memoranda and in the evidence adduced at trial. ITT does not allege fraud, despite its pervasiveness, nor does it urge the Court to pierce a corporate veil, which may not be warranted by the facts. Of course, the effect of such actions, if alleged and proven, would not establish a security interest in the vessel. Moreover, where the mortgage is found to be invalid, issues concerning its fraudulence, which govern its priority, do not arise. Likewise, while it is clear that the law imposes no duty on lenders to inquire as to the existence of prior liens in accepting the Affidavit of Good Faith, the actuality of ownership is not so protected. Ownership is not relevant to the priority to be given a valid mortgage, but relates to the very validity of the security interest itself. *C.I.T. Corp. v. Oil Screw Peggy*, 424 F.2d 767 (5th Cir.1970); *Pascagoula Dock Station v. Merchants & Marine Bank*, 271 F.2d 53 (5th Cir.1959). Any equitable relief which has been or could be sought by ITT is not justified by the circumstances recited herein; further, the Court is unaware of any equitable relief which could effect a transfer of property, where proof of a sale is lacking.

The Court notes that it has been presented with *no* proof that Camaille had authority to sell for the corporation by reason of corporate resolution,[4] by-laws or otherwise. As a mere agent, express and special power to sell is required. La.Civ.Code arts. 438, 439, 2996, 2997.

While there is no doubt in this Court's mind that Camaille could have acted in both a corporate and individual capacity to effect a sale had he been presented with appropriate papers at the closing, and that ITT could have "forced" the sale in writing, as it had "forced" the resolution for the corporate guarantee, due to Camaille's willingness to sign whatever papers ITT required, ITT chose instead to rely on the word and good faith of a man who has since proven untrustworthy, if not criminal. Further, ITT, which was represented by counsel, knew or should have known that the sale and ownership in Camaille had not been legally established and was suspect by virtue of the conflicting statements as to ownership of the vessel prior to closing. Had the ownership not been challenged in this litigation, routine foreclosure on the vessel would probably have occurred; nonetheless, ITT has created its present inability to prove the sale and ownership. ITT can look to Camaille and the corporate guarantor for repayment; ITT cannot, however, look specifically to the M/V RICHARD C which, because no sale has been proven, remains the property of GOMS.

In short, Camaille's ownership of the M/V RICHARD C could only result from a sale of the vessel by GOMS. Where the alleged sale was not manifested in any verbal or written manner, but only, if at all, within the mind of a single person in an inconsistent manner and with total disregard for legal formalities, it is not recognized by law. Although sophisticated businessmen, with the benefit of experienced

---

**3.** Camaille's testimony that title changed from GOMS to Camaille on September 20, 1982, when the JBT construction mortgage was paid out, lends no support to an ownership interest which had to be in existence some five days earlier. It does, however, seriously affect the declaration *in the Master Carpenter's* Certificate of June 14, 1982.

**4.** Although not offered as proof on this point, the Court notes that the JBT mortgage paperwork did include a corporate resolution that does not, however, empower Camaille to sell the vessel. (Exh. ITT–16).

counsel at one time, may have acknowledged and accepted these circumstances, in so doing, they do not create a security interest in property which they cannot prove to be owned by the mortgagor.

## MARITIME LIENS

■ Having found that no preferred ship mortgage is being held by ITT, which claims no other basis for a maritime lien, the Court must now evaluate the character of the remaining claims in this suit. The Court's *in rem* admiralty jurisdiction is necessarily dependent on the existence of a maritime lien. *Jackson v. Inland Oil & Transportation Co.,* 318 F.2d 802 (5th Cir. 1963); 2 *Benedict on Admiralty,* § 21 (6th Ed.1984).

Kennedy claims to have a maritime lien on all of the materials, parts, engines, generators and services it supplied to the M/V RICHARD C through the time of sea trial runs on October 19, 1982. At the same time, Kennedy argues, apparently against itself, that the M/V RICHARD C did not become a vessel until it had been completed at some time after her sea trial, and that a maritime lien under 46 U.S.C. § 971 lies in favor of Kennedy as to some unspecified supplies and services provided to the M/V RICHARD C after she was fully constructed.

■ While the Court is not convinced that Kennedy's maritime claim is being seriously forwarded, it is initially clear that it lacks evidentiary support. The Court has not been given proof by any party that is adequate to legally establish a date for either the launching or the completion of the M/V RICHARD C.[5] In any event, Kennedy is without an *in rem* remedy where its engine and generator package so clearly constituted an integral part of the original construction of the vessel. 1 *Benedict on Admiralty* § 188 (6th Ed.1985);

*Walter v. Marine Office of America,* 537 F.2d 89 (5th Cir.1976).

■ Smatco's attempt at maritime lien status also fails; if an effort were made to prove that the winch sold to the M/V RICHARD C was a "necessary" under 46 U.S.C. § 971 or subject to a "preferred maritime lien" were made to prove that the winch sold to the M/V RICHARD C was a "necessary" under 46 U.S.C. § 971 or subject to a "preferred maritime lien" under 46 U.S.C. § 953, the effort has proven unsuccessful. The argument that the winch was not part of the original construction of the vessel is not only undermined by the fact that the vessel has been shown to belong to the original owner and builder, GOMS, but is further defeated by the evidentiary deficiency relative to establishment of a launching and/or completion date for the M/V RICHARD C. Moreover, the inconclusive evidence relied upon by Smatco indicates that the sale under La.Civ.Code Art. 2456 occurred *prior* to the issuance of certificates allegedly indicating completion.

■ Finally, Lombas' effort to invoke this Court's *in rem* jurisdiction also fails. Initially, this Court doubts that a "charter party" with a non-vessel owner is a maritime contract or can effectively bestow any rights relative to that agreement in admiralty. While it would appear that any alleged "prohibition of liens" clause would not bind Lombas under the factual circumstances presented, Lombas' arguments of maritime contract and maritime tort under 46 U.S.C. § 953 necessarily fail, and are not supported by the facts. *International Marine Towing Inc. v. Southern Leasing Partners, Ltd.,* 722 F.2d 126 (5th Cir.1983). cert. den. — U.S. —, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984). Similarly, no support for the suggestion that Lombas' claim in-

---

**5.** The evidence presented to the Court, in addition to being qualitatively and quantitatively deficient and inconsistent, was somewhat inadvertantly presented by the parties. While the Court might be willing to assume that the M/V RICHARD C was both launched and completed when she was moved to the Lombas dock in

December, 1982, this finding would not aid any maritime claimant, including ITT, which is involved in this suit. In addition, as it relates to ITT only, preferred status would be available to its alleged mortgage only upon a showing that at the time it was made, the mortgage included the "whole" of the vessel. 46 U.S.C. § 922(a).

volves a "necessary" under 46 U.S.C. § 971 has been forwarded.

▮▮▮▮ In addition, the "doctrine of advances" offers Lombas no assistance. The doctrine provides that one who advances funds for the payment of lienable claims is himself entitled to a lien if the advance was made on the credit of the vessel and if the money advanced in fact was used to discharge the claims. *Inland Credit Corp. v. M/T BOW EGRET*, 552 F.2d 1148 (5th Cir.1977); 2 *Benedict on Admiralty*, § 33 (6th Ed.1984). However, ITT has no maritime lien or valid mortgage on the M/V RICHARD C for Lombas to acquire by subrogation. It has further been held that payments due on preferred ship mortgages are not entitled to any presumption that credit is given on the credit of the ship, *Brock v. S/S SOUTHHAMPTON*, 231 F.Supp. 278 (D.Ore 1964), and that charterers cannot have liens by paying for items for which they are primarily responsible under the terms of the charter. *Caribbean Maritime Finance Co., Ltd. v. Marina Mercante Nicaraguense, S.A.*, 470 F.2d 277 (5th Cir.1972); *Schilling v. A/S D/S DANNENBROG*, 320 F.Supp. 628 (2d Cir. 1963). Moreover, it is clear that under facts of this case, the doctrine of advances is unavailable to Lombas where there is no proof offered that the payments were made in reliance on the credit of the vessel, and where the funds were not earmarked or restricted by Lombas for payment of a lien, but actually made payable to GOMS and not Camaille, the alleged mortgagor and owner under the charter party, or Gulf Outlet Management Corporation on behalf of Camaille, as specified in the charter party. (Exh. ITT–45; L–2).

## EQUITABLE LIENS AND JURISDICTION

The Court is reminded that this matter in its present posture is an in *rem action;* all in *personam* claims have been stayed and severed. Accordingly, the arguments advanced by Kennedy and Smatco regarding dissolution of the respective sales is unavailing at this stage of litigation. Assuming that the admiralty law recognizes such a remedy, and that the principle of accession does not apply,[6] the sales were made to GOMS, which is not before the Court in *personam* due to the bankruptcy proceedings.

▮▮▮▮ In addition, the Court does not believe that Lombas has proven that ITT "forebeared" in its collection endeavors in order to receive the Lombas payment prior to seizure of the vessel. However, such a finding would not in itself support an in *rem* action; at best, Lombas would be entitled to recover for ITT's unjust enrichment in equity.

▮▮▮▮ While the Court does believe that Lombas is entitled to recovery for reasonable in *custodia legis* expenses for wharfage after seizure of the M/V RICHARD C,[7] it would appear that such relief is not sufficient in itself to support an in *rem* sale and seizure of a vessel. Despite the fact that they are paid first in priority from the proceeds of a vessel sale, in *custodia legis* expenses do not constitute a maritime lien. Rather, they are an equitable lien arising by virtue of equity and good conscience denial of unjust enrichment. *New York Dock Co. v. The Poznan*, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927).

Finally, ITT is claiming in *custodia legis* expenses in the total stipulated amount of $65,347.13, composed of $34,347.13 in Port-Risk Insurance Premiums and $31,000.00 in United States Marshal's advance costs for seizure. (PTO p. 14). These are the only such expenses being claimed by ITT that appear in the pleadings and are specifically supported by stipulation of counsel or by

---

6. It is nonetheless clear that Kennedy has failed to offer any credible proof that the engine and generator package could be easily removed without damage to the vessel.

7. The Court understands Lombas' in *custodia legis* claim to be composed of per diem wharfage fees only. Lombas' evidence that these expenses totalled $15,900.00 was essentially uncontroverted at trial.

the evidence presented at trial.[8] No party has made issue of the recoverability of these expenses by ITT.

However, the Court concludes that because not one claim in this action constitutes a maritime lien, it is without jurisdiction *in rem.* Without such an initial invocation of admiralty jurisdiction, equitable action against the vessel is unavailable.

## CONCLUSION

In any event, the Court declines to exercise jurisdiction over the permissive state law claims in this matter. The Court has been advised that many creditors have filed claims in the GOMS bankruptcy proceedings. Since *in rem* jurisdiction was erroneously invoked by ITT and the intervening claimants herein, and due to the earlier confusion surrounding ownership of the M/V RICHARD C, there may well be bankruptcy creditors who resisted filing claims in this Court due to a lack of maritime status, yet may have state law liens which prime those being claimed by Kennedy Engine and Smatco. For this reason, adjudication and ranking of all state law liens with regard to the M/V RICHARD C shall be made by the bankruptcy judge presiding over the GOMS proceedings.

Accordingly,

IT IS ORDERED that judgment be entered against plaintiff and intervenors, each party to bear its own costs.

IT IS FURTHER ORDERED that the M/V RICHARD C be and hereby is transferred to the custody of the United States Bankruptcy Court for the Eastern District of Louisiana as an asset in the Gulf Outlet Marine Services, Inc. proceedings, No. 83–01204. Lombas Industries, Inc. shall be paid the amount of $15,900.00, and ITT Industrial Credit Co. the amount of $65,347.13, for *in custodia legis* expenses first in priority from the proceeds of any sale of the M/V RICHARD C made to satisfy state liens in the bankruptcy court.

---

**8.** Although the Court is aware that a consent keeper has been employed, no claim for these fees or expenses, if any, has been made. In addition, no proof relative to the recoverability or the amount of these fees was presented at trial.