418 F.2d 177
 The MASTAN COMPANY, Incorporated, (Plaintiff),
v.
William STEINBERG et al., v. STEAMSHIP SAPPHIRE SANDY, her
engines, tackle, etc., (Defendant), Todd Shipyards
Corporation, Appellant.
 (D.C. Civil Action No. 284-67) No. 17879.
 United States Court of Appeals Third Circuit.
 Argued Oct. 6, 1969.
Decided Nov. 18, 1969.
 
 Edward Gross, Gross & Novak, Newark, N.J., Crowell, Rouse & Varian, New York City, for appellant.
 George D. Byrnes, Zock, Petrie, Sheneman & Reid, New York City (John R. Sheneman, New York City, on the brief), for appellee.
 Before McLAUGHLIN, FORMAN and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 At stake in this admiralty action is the distribution of $55,085.37, deposited in the Registry of the court below following the foreclosure and sale of the ship SS Sapphire Sandy by the United States Marshal. A Special Master determined that the Mastan Company was entitled to the entire proceeds of the sale as holder of a valid first preferred mortgage on the vessel. Todd Shipyards Corporation, a creditor of the ship, has appealed the district court's confirmation of the master's report.
 
 
 2
 In December, 1965, the Sapphire Steamship Lines borrowed $1,296,000 from the Mastan Company. The sole purpose of the loan was to enable Sapphire to purchase three ships, one of which was the Sandy.[1] To secure the loan Sapphire executed a First Preferred Ship Mortgage to Mastan on the purchased vessels. The mortgage and accompanying documents were drafted and recorded in conformity with the Ship Mortgage Act of 1920, 46 U.S.C.A. 911 et seq.
 
 
 3
 Thereafter, in May and June, 1966, Todd performed certain repair work on the Sandy for which an unpaid balance $35,000 existed when Sapphire filed a Chapter XI petition in the Southern District of New York. Sapphire's action prompted Mastan to foreclose its delinquent mortgage of the Sandy then docked in a New Jersey harbor.
 
 
 4
 In its assault upon the priority afforded Mastan's mortgage in the court below, Todd places primary emphasis on the interpretation of Section 922 of the Ship Mortgage Act. That section provides that a mortgage shall be afforded preferred status under certain conditions, one of which is that:
 
 
 5
 '(3) An affidavit is filed with the record of such mortgage to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel.'
 
 
 6
 Although such an affidavit was filed with the Sapphire-Mastan mortgage, Todd asserts that it was a sham which in no wise reflected the parties' actual intent which was to defraud future creditors by encumbering the vessels with massive liens so that no assets of the debtor remained available for the benefit of creditors.
 
 
 7
 Accepting the postulate that the mere filing of an affidavit of good faith will not legitimize a mortgage conceived in fraud, the Special Master concluded after receiving extensive evidence that there was 'no intention or intent to deceive any creditor nor was there any design to hinder, delay or defraud any existing creditor or future creditor.' On the contrary, the master found that the Sapphire-Mastan arrangements were 'all for the betterment of the operation of the business,' and that there were 'affirmative acts and deeds of 'good faith."[2] At this juncture, it will be observed that even Todd's expert witness was unwilling to employ the term 'fraud' in response to a specific inquiry by the master but chose instead to employ the term 'imprudent' to the Mastan-Sapphire transactions.
 
 
 8
 Our own examination of the record leads us to conclude that there was abundant evidence of good faith on the part of the parties to the mortgage. To be sure, we are not left with any impression that the lower court's determination of good faith was 'clearly erroneous.' In the absence of such clear error, the conclusions reached below must stand. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954).
 
 
 9
 In an attempt to overcome this determination, Todd suggests that the subjective good faith of the parties does not control where the mortgagor is hopelessly insolvent at the time of the execution of the mortgage. Conceding that the Ship Mortgage Act contains no such definition of fraud, Todd urges the application of the New York Debtor and Creditor Law, McKinney's Consol.Laws, c. 12, Sections 273 and 274, which provide essentially that fraud is presumed as a matter of law where a person making a transfer is, or will be rendered insolvent, and the transfer is made without fair consideration. It is Todd's position that because the Mastan-Sapphire mortgage was executed in New York, that state's interpretation of 'good faith' in debtor-creditor transactions should be used in gauging the standards employed in the federal statute.
 
 
 10
 Assuming that state standards have any application to the Ship Mortgage Act, the appellant's argument must fail against the specific finding by the Special Master that the mortgage was 'patently supported by full and fair consideration.' This finding in itself, which we do not view as clearly erroneous, would remove the transaction from the purview of the New York statute.
 
 
 11
 Moreover, we cannot accept the contention that state standards are controlling. Admiralty is by constitutional directive within the orbit of federal concern. Panama R.R. Co. v. Johnson, 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748 (1924). And where, as here, Congress has legislated standards for the enforcement of suits in admiralty, federal standards are controlling. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953). While the facts of the present case do not necessitate any extensive examination of the elements of 'good faith' as employed in the Act, it seems clear that to engraft the various nuances of state law onto federal legislation would introduce an undesirable lack of uniformity in the interpretation of congressional enactments. In the present case, it would condition the validity of ship mortgages on the idiosyncracies of local law rather than their conformity to national interests.
 
 
 12
 The clear congressional intent in enacting the Ship Mortgage Act was to encourage and promote the continued development of the American merchant marine. Even the most casual familiarity with this industry will reveal the recent difficulties it has experienced in competing in the international market. Its efforts to extricate itself from its diminishing financial dominance in the world market are matters of vital national concern. The further imposition of state standards on the industry would be an unwarranted intrusion into an area which bespeaks its national implications. We conclude that the court below acted correctly in holding that the New York statute was not controlling on the issue of good faith. See United States v. Oil Screw Ken Jr., 275 F.Supp. 792 (E.D.La.1967); United States v. American Gas Screw Franz Joseph, 210 F.Supp. 581 (D. Alaska 1962).
 
 
 13
 Our conclusion that the Mastan mortgage was valid does not end the inquiry. Todd further contends that it was entitled to share in the proceeds of sale under the equitable doctrine of marshalling assets.[3] The Special Master concluded that marshalling was inappropriate because the assets were non-maritime property beyond the jurisdiction of the admiralty court.[4] We agree. Moreover, there is serious doubt whether marshalling is ever proper where its effect would relegate the preferred mortgage to a status inconsistent with the express priority given it by statutory direction.
 
 
 14
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 The original agreement was executed on December 28, 1965, and provided for the loan of $1,296,000. The first part of the transaction was accomplished on December 29 when the sum of $864,000 was advanced to Sapphire for the purchase of two ships. Included in this amount was a check for $100,000 made payable to Sapphire and endorsed to Mastan to be held pending completion of repairs on the purchased vessels. The second part of the agreement was completed on January 21, 1966, when the additional sum of $432,000 was advanced to Sapphire to buy a third vessel. In August, 1966, the parties entered into an agreement extending the loan for a period of twenty-seven months, thereby reducing the monthly payments
 
 
 [2]
 As further evidence of the good faith of the parties, the Special Master noted that Sapphire's corporate officers made personal contributions of approximately $450,000 to enable Sapphire to purchase the three vessels
 
 
 [3]
 Todd also claims priority as a tort claimant under 46 U.S.C.A. 953. It does so on the basis of the assertion that it was defrauded into making repairs. It seems clear, however, that such a claim of fraud, i.e., the inability of the ship to respond to the payment for repairs, is not a tort claim within the meaning of 953, since recordation of the ship mortgage is notice to those who subsequently contract with the vessel that it is first pledged to the lien of the mortgage. See Diaz v. the SS Seathunder, 191 F.Supp. 807 (D.Md.1961); Atlantic Steamer Supply Co. v. the SS Tradewind, 153 F.Supp. 354 (D.Md.1957)
 
 
 [4]
 The assets involved were maritime insurance proceeds in the hands of British underwriters. There were also certain accounts receivable which the master determined to be either nonexistent or having no worth