896 F.2d 452
 1990 A.M.C. 1702, 12 UCC Rep.Serv.2d 97
 CHASE MANHATTAN FINANCIAL SERVICES, INC., doing business as
Chase Manhattan of Oklahoma, a Delaware
Corporation, Plaintiffs-Appellees,
v.
David J. McMILLIAN, in personam; Ruby Walters; Wagoner
Lumber Company Inc., an Oklahoma corporation; Leroy Smith,
doing business as Circle L. Cabinet Shop; Patriot, Her
Engines, Tackle, Apparel, etc., in rem, Defendants-Appellants,
Virgil WALTERS, Defendant-Third-Party-Plaintiff-Appellant,
v.
OKLAHOMA HOUSEBOAT MANUFACTURERS, INC., Third-Party-Defendant,
Appeal of P & H SUPPLY; Muskogee Metal Fabricators Inc.,
Claimants-Appellants.
 No. 88-1832.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 14, 1990.
Rehearing Denied Dec. 5, 1990.
 
 R. Dow Bonnell and David K. Hoel, Hoel, Bonnell, Edmison & Deuschle, P.A., Tulsa, Okl., on the brief, for plaintiffs-appellees.
 Jon Tom Staton, Muskogee, Okl., on the briefs, for defendants-appellants.
 Before HOLLOWAY, Chief Judge, and GARTH* and TACHA, Circuit Judges.
 TACHA, Circuit Judge.
 
 
 1
 This appeal is from an order of the district court granting priority to the claim of Chase Manhattan Financial Services, Inc. (Chase), as the holder of a preferred ship mortgage in the vessel Patriot. The appellants and competing claimants to the proceeds from the sale of the Patriot are the landlord of the boatyard and the suppliers of the raw materials and labor used to construct the Patriot. The appellants attack on various grounds the validity of Chase's preferred ship mortgage, and contend that, even if Chase has a valid preferred ship mortgage, their state statutory labor and materials liens have priority because these liens were created before the completion of construction and the launching of the Patriot. We affirm.[1]
 
 I. History of the Case
 
 2
 This case arose out of the original construction of the vessel Patriot by Oklahoma Houseboats Manufacturing, Inc. (OHM). On October 30, 1986, David McMillian (McMillian), the buyer and mortgagor; Chase, the mortgagee; and Russell Bickers (Bickers), the sales agent and secretary/treasurer of the seller OHM met to complete the documentation for the sale and financing transactions for the Patriot. At this meeting the parties completed and Bickers signed a manufacturer's statement of origin for the Patriot. Bickers signed a sales agreement form in blank, and the terms of the agreement were later filled in.
 
 
 3
 At the meeting Chase loaned $50,000 to McMillian to purchase the Patriot, which at that time was 90 percent complete, and McMillian executed a promissory note and security agreement in favor of Chase. The note and security agreement provided that the Patriot must be kept at Sequoyah Bay Marina, Muskogee, Oklahoma, unless Chase gave McMillian written consent to keep the Patriot elsewhere. Additionally, the note and security agreement provided that if McMillian failed to keep the terms of the agreement Chase could declare a default and demand immediate payment in full. McMillian also executed a power of attorney in favor of Carol Matthews of Carol Matthews Vessel Documentation, Inc. (Matthews), a professional vessel documentation service located in Houston, Texas. Matthews' services were necessary to facilitate Chase's application for a preferred ship mortgage with the United States Coast Guard (Coast Guard).
 
 
 4
 Chase issued a check at the meeting in the amount of $50,000 jointly to the borrower McMillian and the seller OHM in accordance with the routine practice in the consumer lending field. McMillian immediately endorsed the check over to OHM at the meeting.
 
 
 5
 On April 7, 1987, the Coast Guard issued the Patriot's certificate of documentation and its official number. On April 13, 1987, Matthews completed the detailed application process and executed a first preferred ship mortgage on behalf of McMillian, the mortgagor, and in favor of Chase as mortgagee. The mortgage application was accompanied by the requisite affidavit of good faith executed by Matthews for McMillian. Matthews was not aware of and had no knowledge of any existing liens on the Patriot at the time she executed the affidavit. On July 27, 1987, the Patriot's first preferred ship mortgage was recorded by the Coast Guard and the particulars of the mortgage were endorsed on the certificate of documentation.
 
 
 6
 Meanwhile, in June 1987 Chase was first notified that McMillian was in default under the terms of the note and security agreement because the Patriot was no longer being kept at the Sequoyah Bay Marina. Chase declared McMillian to be in default and filed this action based on the district court's admiralty jurisdiction, 28 U.S.C. Sec. 1333 and 46 U.S.C. Sec. 951, to enforce its preferred ship mortgage pursuant to the Ship Mortgage Act of 1920, ch. 250, Sec. 30, 41 Stat. 1000 (codified as amended at 46 U.S.C. Secs. 911-984) ("SMA").[2] Chase named as defendants the appellants in this case. The appellants and their respective state law lien claims are as follows: Virgil and Ruby Walters, the owners of the construction site, claim a lien on the Patriot for back rent; Leroy Smith, the cabinet maker and interior contractor for the Patriot, claims a labor and material lien; Wagoner Lumber Company claims a lien for materials furnished for the construction of the Patriot; Muskogee Metal Fabricators claims a labor and material lien for furnishing and bending steel for the Patriot's hull; and P & H Supply, Inc. claims a lien for plumbing and fixtures provided to the Patriot. Defendant Virgil Walters also filed a counterclaim against Chase and a cross claim against McMillian alleging fraud and conspiracy in obtaining the preferred ship mortgage.
 
 
 7
 After a bench trial, the district court ruled that Chase had a valid preferred ship mortgage under SMA section 922. The court specifically found that Chase did not know of the existence of any bad faith on the part of McMillian that would defeat the SMA section 922(a)(3) requirement that the mortgage be made in good faith and without any design to defraud any lienor or creditor of the mortgaged vessel. Additionally, the court found that Virgil Walters had failed to establish fraud in connection with McMillian's and Chase's actions in obtaining the preferred ship mortgage on the Patriot. The court thus declined to award damages on Walters' counter and crossclaims. Finally, the district court held that Chase's preferred ship mortgage took priority over the appellants' claims under SMA section 953 because those claims were not preferred maritime liens.
 
 
 8
 Appellants claim that the district court erred in: (1) finding that Chase had satisfied the documentation and title requirements for obtaining a preferred ship mortgage under SMA section 922; (2) finding that there was no fraud in the documentation and execution of the mortgage and that Chase was unaware of the alleged fraudulent documentation; and (3) finding that the preferred ship mortgage had priority over their material and labor liens which were created prior to the completion of construction and launching of the Patriot.
 
 II. "Maritime" Liens
 
 9
 Before addressing appellants' arguments, we first must characterize the nature of appellants' claims as "maritime" or nonmaritime "dry land" liens. See G. Gilmore & C. Black, The Law of Admiralty 586-89 (2d ed. 1975) (outlining the significant differences between common law or state law statutory liens and "maritime" liens) [hereinafter Gilmore]. This characterization is fundamental to our subsequent analysis, because preferred maritime liens take priority over a preferred ship mortgage, see SMA Sec. 953(b), whereas a nonmaritime lien is subordinate, see id. and discussion infra pp. 461-462.
 
 
 10
 A maritime lien arises for contract or tort claims against a maritime res for goods and services supplied to it or injury caused by it. See Gilmore at 587-89; 2 S. Friedell, J. Geraghty, S. Bellman & J. Loo, Benedict on Admiralty Sec. 31, at 3-1 to 3-2 (7th ed. 1988) [hereinafter 2 Benedict ]. Maritime liens generally are "secret" in that neither possession nor notice through filing is required to establish their validity. See Gilmore at 588; Comment, The Federal Maritime Lien Act: A Review and a Prospectus, 20 Hous.L.Rev. 861, 864 n. 17 (1983) [hereinafter Comment, 20 Hous.L.Rev.]; Comment, Developments in the Law of Maritime Liens, 45 Tul.L.Rev. 574, 575 (1971) [hereinafter Comment, 45 Tul.L.Rev.]. Only an admiralty court acting in rem can foreclose a maritime lien, because admiralty law engages in the fiction that the ship itself is the "person" who committed the offense and is legally responsible for the consequences. See Gilmore at 588-94; Hebert, The Origin and Nature of Maritime Liens, 4 Tul.L.Rev. 381, 382-92 (1930) [hereinafter Hebert, 4 Tul.L.Rev.]; Note, Priorities of Maritime Liens, 69 Harv.L.Rev. 525, 525-27 (1956) [hereinafter Note, 69 Harv.L.Rev.]; Comment, 20 Hous.L.Rev. at 864 & nn. 20-21.
 
 
 11
 In American admiralty law the existence of a maritime lien is synonymous with the scope of admiralty jurisdiction. See Gilmore at 622; H. Baer, Admiralty Law of the Supreme Court 464-65 (3d ed. 1979) [hereinafter Baer]; Robinson, "Contract" Jurisdiction in Admiralty, 10 Tul.L.Rev. 359, 360-62 (1936) [hereinafter Robinson, 10 Tul.L.Rev.]; Note, 69 Harv.L.Rev. at 526. It is an established principle of American admiralty law that contracts for building a ship, or supplying materials for the original construction of a ship, are not "maritime" contracts within the province of admiralty jurisdiction. See Gilmore at 16; Baer at 464-65; 1 S. Friedell, Benedict on Admiralty Sec. 186, at 12-30 to 12-31 (7th ed. 1988) [hereinafter 1 Benedict ]; Black, Admiralty Jurisdiction: Critique and Suggestions, 50 Colum.L.Rev. 259, 264 (1950); Robinson, 10 Tul.L.Rev. at 361. "The Supreme Court so held in 1857 in People's Ferry Co. v. Beers, [61 U.S. (20 How.) 393, 15 L.Ed. 961 (1857) ], and has followed that ruling both in dicta and decision in every subsequent case in which the subject has been presented or reference to it made." 1 Benedict Sec. 186, at 12-30 (footnotes omitted) (citing in part East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 872 n. 7, 106 S.Ct. 2295, 2303 n. 7, 90 L.Ed.2d 865 (1986); Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 889, 6 L.Ed.2d 56 (1961); New Bedford Dry Dock Co. v. Purdy, 258 U.S. 96, 99, 42 S.Ct. 243, 243, 66 L.Ed. 482 (1922); Thames Towboat Co. v. The Schooner "Francis McDonald", 254 U.S. 242, 243, 41 S.Ct. 65, 65, 65 L.Ed. 245 (1920); The Winnebago, 205 U.S. 354, 363, 27 S.Ct. 509, 512, 51 L.Ed. 836 (1907); Edwards v. Elliott, 88 U.S. (21 Wall.) 532, 553, 22 L.Ed. 487 (1874)).
 
 
 12
 The necessary corollary to this principle is that contracts for building or supplying materials for the original construction of ships do not create "maritime" liens because such contracts are not "maritime" contracts. See Gilmore at 630 n. 98; 1 Benedict Sec. 125, at 8-18; Hebert, 4 Tul.L.Rev. at 398-99; Ray, Maritime Contract Liens, 47 Tul.L.Rev. 587, 606 (1973) [hereinafter Ray, 47 Tul.L.Rev.]. Even after a ship has been launched, but before it is sufficiently advanced to function as designed, any labor, materials, or equipment furnished to the ship that are necessary for its completion do not give rise to "maritime" liens. E.g., The Francis McDonald, 254 U.S. at 245, 41 S.Ct. at 66; The Winnebago, 205 U.S. at 362, 27 S.Ct. at 512; Nilo Barge Line, Inc. v. The M/V Bayou DuLarge, 584 F.2d 841, 842-43 (8th Cir.1978); The Boat La Sambra v. Lewis, 321 F.2d 29, 29-31 (9th Cir.1963); Hatteras of Lauderdale, Inc. v. Gemini Lady, 662 F.Supp. 1525, 1527 (S.D.Fla.1987), aff'd, 853 F.2d 848 (11th Cir.1988); see also 1 Benedict Sec. 186, at 12-31 & n. 5; Robinson, 10 Tul.L.Rev. at 364-66; Comment, 45 Tul.L.Rev. at 602-03.
 
 
 13
 Appellants admit that their claims are for materials, labor, and services rendered prior to the completion of construction on the Patriot. The district court made a finding of fact that the Patriot was ninety-nine percent complete on January 7, 1987. The record shows that all of appellants' materials and labor were furnished long before this approximate date of completion.[3] We therefore hold that appellants' claims constitute nonmaritime liens.
 
 
 14
 III. Requirements for a Preferred Ship Mortgage
 
 
 15
 We next determine whether Chase has a valid preferred ship mortgage entitling it to first priority to the proceeds from the sale of the Patriot. A short review of the history of the SMA is in order.
 
 
 16
 Prior to the passage of the SMA, the Supreme Court in Bogart v. The John Jay, 58 U.S. (17 How.) 399, 15 L.Ed. 95 (1854), held that a mortgage on a ship was not a maritime contract and therefore not within admiralty jurisdiction. See Gilmore at 688. As a consequence of this decision, the value of a mortgagee's security interest was greatly reduced. As a nonmaritime claimant the mortgagee could not initiate foreclosure proceedings in admiralty. If a maritime lien claimant initiated foreclosure proceedings in admiralty, the ship would be sold and first priority given to all maritime claims, including those arising after the mortgage. See Merchants Nat'l Bank v. Ward Rig No. 7, 634 F.2d 952, 955 (5th Cir.1981); Gilmore at 688-90; Gyory, Security at Sea: A Review of the Preferred Ship Mortgage, 31 Fordham L.Rev. 231, 232-34 (1962) [hereinafter Gyory, 31 Fordham L.Rev.]; Smith, Ship Mortgages, 47 Tul.L.Rev. 608, 608-09 (1973) [hereinafter Smith, 47 Tul.L.Rev.].
 
 
 17
 The primary purpose of the SMA was to stimulate private investment in the shipping industry by offering greater protection to investors. See Smith, 47 Tul.L.Rev. at 608. The SMA granted the holder of a preferred ship mortgage the right to proceed in admiralty with a preferred status over all claims except certain maritime liens and expenses, and fees and costs fixed by the court. See Merchants Nat'l Bank, 634 F.2d at 955; Gilmore at 695-805; Gyory, 31 Fordham L.Rev. at 234-37; Smith, 47 Tul.L.Rev. at 610-13.
 
 
 18
 The statutory requirements for a preferred ship mortgage are contained in 46 U.S.C. section 922(a), which provides in relevant part:
 
 
 19
 A valid mortgage which at the time it is made, includes the whole of any vessel of the United States ..., shall, in addition, have, in respect to such vessel and as of the date of the compliance with all the provisions of this subsection, the preferred status given by the provisions of section 953 of this title, if--
 
 
 20
 (1) The mortgage is endorsed upon the vessel's documents in accordance with the provisions of this section;
 
 
 21
 (2) The mortgage is recorded as provided in section 921 of this title, together with the time and date when the mortgage is so endorsed;
 
 
 22
 (3) An affidavit is filed with the record of such mortgage to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor of any lienor of the mortgaged vessel;
 
 
 23
 (4) The mortgage does not stipulate that the mortgagee waives the preferred status thereof; and
 
 
 24
 (5) The mortgagee is ... a citizen of the United States.
 
 
 25
 46 U.S.C. Sec. 922(a). Title 46 of the Code of Federal Regulations subpart 67.37 adds the additional requirement that the mortgagor must actually hold legal title to the vessel at the time of the execution and recordation of the mortgage. 46 C.F.R. Sec. 67.37-5(c); see also C.I.T. Corp. v. Oil Screw Peggy, 424 F.2d 767, 768 (5th Cir.1970) (per curiam) (preferred ship mortgage did not attach to radar equipment leased by shipowner/mortgagor in which mortgagor did not have an ownership interest); ITT Indus. Credit Co. v. The M/V Richard C, 617 F.Supp. 761, 764 (E.D.La.1985) ("It is further obvious that a [preferred ship] mortgage cannot attach to property not owned by the mortgagor.").
 
 A. SMA Filing Requirements
 
 26
 Appellants first argue that Chase has not satisfied the requirement of SMA section 922(a) because the Patriot was not a "vessel" or a "vessel of the United States" at the time of the execution and recordation of the mortgage. This argument plainly fails on the facts of this case. The trial court found that the Patriot was ninety-nine percent complete on January 1, 1987. The Patriot therefore was a "vessel" as of this date. See 1 U.S.C. Sec. 3; discussion supra p. 457 and infra p. 462. The Patriot became a "vessel of the United States" on April 7, 1987, when the Coast Guard issued the Patriot's certificate of documentation and its official number. See 46 U.S.C. Secs. 911(1), (2), (4); 46 C.F.R. Sec. 67.01-1, par. (4) ("Documented vessel means a vessel for which a valid Certificate of Documentation is outstanding."). Approximately one week afterward, on April 13, 1987, Matthews executed the preferred ship mortgage on the Patriot, and on July 27, 1987, the Coast Guard recorded the mortgage.
 
 
 27
 Appellants also argue that Chase's preferred ship mortgage is invalid because the required documentation was "inadequate." However, appellants have failed to demonstrate the existence of a single defect in the actual documentation that warrants rendering the mortgage invalid. The district court made specific findings on the Patriot's mortgage documentation, ruling that: (1) Matthews had gathered the necessary documentation and forwarded it to the Coast Guard; (2) on April 7, 1987, the Coast Guard issued the Patriot's certificate of documentation; and (3) on July 27, 1987 the Coast Guard recorded the Patriot's preferred ship mortgage and endorsed the particulars of the mortgage on the Patriot's certificate of documentation. These findings are not clearly erroneous.
 
 
 28
 Given the strength and specificity of the district court's factual findings regarding the documentation for the Patriot's preferred ship mortgage, it is evident that the true nature of appellants' inadequate documentation argument is a veiled collateral attack on the district court's conclusions that "[t]here was no showing that [Chase] knew of the existence of any bad faith on the part of McMillian so as to taint the derivative good faith requirement imposed on [Chase that would] defeat the attainment of the preferred status provided by [section] 922(a)," and that "[appellant] Walters has failed to sustain his burden of establishing fraud in connection with [Chase's] and McMillian's actions in obtaining the preferred ship mortgage status for the Patriot." The essence of appellants' argument is that Chase "acted in reckless disregard of the truth of the substance of the documents" because the mortgage documents were signed in blank by McMillian at the October 30, 1986 sale and financing meeting and Matthews later filled in the contents when she executed the mortgage without independently verifying the information given to her by McMillian.
 
 
 29
 Section 922(a)(3) requires that the mortgagor file an affidavit with the mortgage "to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel." 46 U.S.C. Sec. 922(a)(3); see 46 C.F.R. Sec. 67.37-1(a)(3) (1988) (mortgagor is the party required to file affidavit of good faith); see generally Gilmore at 712-13. The mortgagee also has a "derivative" good faith requirement under section 922(a)(3). The Seventh Circuit described this "derivative" good faith requirement in In re Meredosia Harbor & Fleeting Service, Inc., 545 F.2d 583 (7th Cir.1976), cert. denied, 430 U.S. 967, 97 S.Ct. 1649, 52 L.Ed.2d 359 (1977):
 
 
 30
 The banks would have us construe Section 922(a)(3) in a pro forma manner, viz.: once the affidavit is made the Section's requirement is met without more. If the affidavit is fraudulent, the appellants argue that recourse should be had against the affiant rather than the mortgagee. We disagree. The Section 922(a)(3) affidavit requirement demands assurance that the "mortgage is made in good faith." The good faith requirement applies to the mortgage transaction. This creates, in turn, a derivative good faith requirement for the mortgagee. Upon a showing that the mortgagee knew of the mortgagor's bad faith, such knowledge will trigger Section 922(a)(3). Since each of the requirements of Section 922(a) is independently necessary for a ship's mortgage to attain preferred status, the mortgagee's bad faith will defeat a mortgage's aspiration towards preferred status.
 
 
 31
 Id. at 587-88. Absent circumstances of fraud, however, the SMA imposes no affirmative duty on lenders to inquire as to the existence of prior liens before accepting the mortgagor's affidavit of good faith. See Pascagoula Dock Station v. Merchants & Marine Bank, 271 F.2d 53, 54-55 (5th Cir.1959); ITT Indus. Credit Co. v. The M/V Richard C, 617 F.Supp. 761, 766 (E.D.La.1985); cf. Mastan Co. v. Steinberg, 418 F.2d 177, 178-79 (3d Cir.1969), cert. denied, 397 U.S. 1009, 90 S.Ct. 1238, 25 L.Ed.2d 422 (1970) (upholding "imprudent" but not "fraudulent" affidavit of good faith where parties entered into mortgage in subjective good faith, even though mortgagor was insolvent at the time of execution of the mortgage).
 
 
 32
 We agree with the district court's determination that there was no evidence of fraud in connection with Chase's and McMillian's actions in obtaining the preferred ship mortgage. Given that fraud was not involved in the obtaining of the mortgage, and that Chase had no knowledge of bad faith on the part of McMillian, Chase's failure to verify independently the information given by McMillian does not render the affidavit of good faith void under SMA section 922(a)(3).
 
 B. Transfer of Title
 
 33
 Appellants argue that the district court erred in concluding that title to the Patriot passed to McMillian on October 30, 1986 when the parties met to complete the sale and financing transaction for the Patriot. Chase must prove McMillian's ownership of the Patriot as part of its burden of establishing a valid preferred ship mortgage. See C.I.T. Corp., 424 F.2d at 768; ITT Indus. Credit Co., 617 F.Supp. at 765. State law defines what constitutes legal title because contracts for the sale of a ship are not "maritime" and thus admiralty jurisdiction does not apply. See S.C. Loveland, Inc. v. East West Towing, Inc., 608 F.2d 160, 164 (5th Cir.1979), cert. denied, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); see also St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co., 666 F.2d 932, 938 (5th Cir.1982) (per curiam) (adopting district court opinion); ITT Indus. Credit Co., 617 F.Supp. at 765; see generally Gilmore at 26 & n. 90 (contracts for the sale of vessels are not within admiralty jurisdiction). We thus look to the law of Oklahoma to determine when title transferred.
 
 
 34
 Chase's evidence of McMillian's title consisted of those documents presented at the sale and financing meeting on October 30, 1986: (1) the builder's certificate; (2) the manufacturer's statement of origin; and (3) the sales agreement. The record indicates that Bickers, a sales agent and the secretary/treasurer of OHM, signed the sales agreement form in blank at the closing. The parties did, however, complete the manufacturer's statement of origin at the closing, and Bickers signed it in his capacity as the secretary/treasurer of OHM.
 
 
 35
 As appellants correctly point out, the builder's certificate is prima facie, but not conclusive, evidence of title because it is part of the paperwork required by the Coast Guard for the certificate of documentation process. See 46 U.S.C. Sec. 12104(3) (certificate of documentation is not conclusive evidence of ownership where ownership is in issue); St. Paul Fire & Marine Ins. Co., 666 F.2d at 938 (ship's documentation of title is prima facie but not conclusive evidence of ownership). However, we find that the manufacturer's statement of origin and the sales agreement together constitute a valid contract and establish that under Oklahoma law title to the Patriot passed to McMillian at the sale and financing meeting on October 30, 1986.
 
 
 36
 Section 2-401 of title 12A of the Oklahoma statutes governs when the seller of a good conveys title to the buyer. Section 2-401 provides in relevant part:
 
 
 37
 (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act.... Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.
 
 
 38
 ....
 
 
 39
 (3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods,(a) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or
 
 
 40
 (b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.
 
 
 41
 Okla.Stat.Ann. tit. 12A, Sec. 2-401 (1963). Section 2-501 governing the identification of goods states in relevant part:
 
 
 42
 (1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers ... Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs ...
 
 
 43
 (b) if the contract is for the sale of future goods ... when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers....
 
 
 44
 Id. Sec. 2-501.
 
 
 45
 Appellants focus their argument on section 2-401(3)(a) and contend that under Oklahoma law the manufacturer's statement of origin does not constitute a "document of title" because Bickers failed to complete the endorsement form stating all liens or encumbrances on the Patriot. Section 804.4B of title 63 of the Oklahoma statutes requires for a valid certificate of title that:
 
 
 46
 B. In the event of the sale or transfer of the ownership of any vessel, boat, motorboat, or motor therefor, the holder of such certificate of title and registration issued under provisions of this section shall endorse on the form provided on the back of said title a complete assignment thereof with a statement of all liens or encumbrances on such vessel, motorboat or motor and such signature of the transferor shall be made under the penalties of perjury.
 
 
 47
 Okla.Stat.Ann. tit. 63, Sec. 804.4B (1984). Assuming arguendo that the unendorsed manufacturer's statement of origin was not a "document of title" for purposes of section 2-401(3)(a), we turn to section 2-401(3)(b).
 
 
 48
 Bickers signed both the completed manufacturer's statement of origin and the incomplete sales agreement at the mortgage closing. Chase issued a check for $50,000, the balance of the purchase price for the Patriot after McMillian's down payment, jointly to McMillian and OHM. McMillian immediately endorsed the check over to OHM at the October 30, 1986 meeting, and Bickers accepted it. The appellants do not dispute the purchase price of the Patriot or any other terms of the sale. Rather they contend that the sales agreement signed by Bickers at the October 30th meeting could not convey title under section 2-401(3)(b) because it did not specifically identify the Patriot. Although the sales agreement itself did not specifically identify the Patriot as the good being sold, OHM's manufacturer's statement of origin, signed by Bickers at the closing in his capacity as the secretary/treasurer of OHM, clearly did:
 
 
 49
 The undersigned MANUFACTURER hereby certifies that the new boat or motor described below, the property of said MANUFACTURER, has been transferred this 30th day of Oct., 1986 on Invoice No. 1001 to David J. McMillian whose address is Rt. 2 Box 256, Wagoner, Okla. 74467.
 
 
 50
 YEAR 1986 MODEL Houseboat 14 X 62 ft. TRADE NAME Patriot SERIAL NO. OKHOKHo1F6
 
 
 51
 We hold that the manufacturer's statement of origin and the sales agreement taken together satisfy the requirements of section 2-501, and conclude that under section 2-401(3)(b) title to the Patriot passed to McMillian on October 30, 1986. We therefore hold that Chase has satisfied all the statutory requirements of SMA section 922 and holds a valid preferred ship mortgage on the Patriot.
 
 IV. Priorities Under SMA Section 953
 
 52
 Having determined the status of the parties as nonmaritime claimants and the holder of a preferred ship mortgage, we look to SMA section 953 to ascertain who has priority to the proceeds from the sale of the Patriot. SMA section 953(b) states:
 
 
 53
 Upon the sale of any mortgaged vessel by order of a district court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all preexisting claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of section 952 of this title, shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed by the court.
 
 
 54
 46 U.S.C. Sec. 953(b). Section 953(a) defines a preferred maritime lien as:
 
 
 55
 (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage.
 
 
 56
 46 U.S.C. Sec. 953(a). Although the section 953(a) definition itself does not include the word "maritime," the preferred lien arising prior in time unquestionably must be a maritime lien. See In re Alberto, 823 F.2d 712, 717 n. 8 (3d Cir.1987); United States v. Pacific Far East Lines, Inc., 809 F.2d 1435, 1437 (9th Cir.1987) (adopting district court opinion in part); Gulf Coast Marine Ways v. The J.R. Hardee, 107 F.Supp. 379, 385 (S.D.Tex.1952); Gyory, 31 Fordham L.Rev. at 258.
 
 
 57
 As discussed above, the claims of the appellants for materials and labor used in the construction of the Patriot are nonmaritime dry land liens. See discussion supra pp. 456-457. Under SMA section 953(b), it is universally recognized that a preferred ship mortgage has priority over nonmaritime liens. E.g., In re Alberto, 823 F.2d at 717 n. 8 (a valid preferred ship mortgage prevails over all nonmaritime liens); Pacific Far East Lines, Inc., 809 F.2d at 1438 (only maritime liens result in subordination of preferred ship mortgage); Gulf Coast Marine Ways, 107 F.Supp. at 385 (nonmaritime lien cannot take priority over SMA preferred mortgage); see also 2 Benedict Secs. 51-52, at 4-1 to 4-12; Connor, Maritime Lien Priorities: Cross Currents of Theory, 54 Mich.L.Rev. 777, 815 (1956); Ray, 47 Tul.L.Rev. at 606; Varian, Rank and Priority of Maritime Liens, 47 Tul.L.Rev. 751, 764 (1973); Willard, Priorities Among Maritime Liens, 16 Cornell L.Q. 522, 527 n. 22 (1931); Note, 69 Harv.L.Rev. at 531; see generally Gilmore at 733-806 (discussing priorities of maritime liens and ship mortgages). In spite of the voluminous authority to the contrary, appellants contend that their nonmaritime liens should take priority over Chase's preferred ship mortgage because their liens "attached" prior to the time the Patriot was completed and came into existence as a "vessel" capable of being mortgaged under section 922 of the SMA. To support their argument appellants rely on North Pacific Steamship Co. v. Hall Brothers Marine Railway & Shipbuilding Co., 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919) for the proposition that "a ship is born when she is launched," id. at 127, 39 S.Ct. at 223 (quoting Tucker v. Alexandroff, 183 U.S. 424, 438, 22 S.Ct. 195, 201, 46 L.Ed. 264 (1902)), and argue essentially that because their materials and labor were furnished before the Patriot was launched, the Patriot was not yet a "vessel" eligible for a preferred ship mortgage, and therefore the principle of first in time, first in right, should govern.
 
 
 58
 Appellants' argument is fundamentally flawed. As explained previously, it is precisely because their claims are for materials and labor furnished prior to the completion[4] of the Patriot as a vessel that their liens are nonmaritime and thus subordinant to a preferred ship mortgage. We therefore reject appellants argument and hold that Chase's preferred ship mortgage gives Chase priority to the proceeds from the sale of the Patriot over the competing nonmaritime claims of the appellants.
 
 
 59
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Leonard I. Garth, United States Circuit Judge for the Third Circuit, sitting by designation
 
 
 [1]
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument
 
 
 [2]
 Congress has subsequently revised the Ship Mortgage Act. See Act of November 23, 1988, Pub.L. No. 100-710, 102 Stat. 4735 (codified at 46 U.S.C. Secs. 30101-31343); H.R.Rep. No. 918, 100th Cong., 2d Sess., reprinted in 1988 U.S.Code Cong. & Admin. News 6104. However, these revisions do not apply to this civil action because the parties filed the case prior to January 1, 1989. See Act of November 23, 1988, Pub.L. No. 100-710, Sec. 107, 102 Stat. 4735, 4752
 
 
 [3]
 Muskogee Metal Fabricators, Inc. has the most recent claim, which is for metal brackets furnished to the Patriot on August 8, 1986
 
 
 [4]
 We note that the Supreme Court in Thames Towboat Co. v. The Schooner "Francis McDonald", 254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245 (1920), rejected the appellants' argument that the definitive point in time for determining the maritime nature of a contract is the launching of the vessel. In The Francis McDonald, the Supreme Court expressly held that a contract to furnish the materials and labor for the completion of a ship, made and performed after the ship was launched, but before it was sufficiently advanced to perform the functions for which it was intended, was nonmaritime. Id. at 243-44, 41 S.Ct. at 65-66; see also cases cited supra p. 457