**In re Erhan OZEY, Debtor.**

**Margaret Lynn KEELING, Plaintiff,**

v.

**Erhan OZEY, Defendant.**

**COLUMBIA DEVELOPMENT CORPORATION, Savannah Investment Company, and Lee A. Keeling, Plaintiffs,**

v.

**Erhan OZEY, Defendant.**

**Joseph Q. ADAMS, Trustee, Plaintiff,**

v.

**Erhan OZEY, Defendant.**

Bankruptcy No. 93–04157–W.
Adv. Nos. 94–0113–W, 94–0115–W and 94–0177–W.

United States Bankruptcy Court, N.D. Oklahoma.

Aug. 8, 1994.

See also, 171 B.R. 116.

Steven J. Adams, Tulsa, OK, for trustee.

Phyllis A. Dewitt, Tulsa, OK, for Margaret Lynn Keeling.

Steven K. Balman, Tulsa, OK, for Columbia Development Corp., Savannah Investment Co. and Lee A. Keeling.

J. Philip Adamson, Tulsa, OK, for defendant Erhan Ozey.

## MEMORANDUM OPINION AND ORDER

MICKEY DAN WILSON, Chief Judge.

The above-styled adversary proceedings under 11 U.S.C. § 727(a) were consolidated for trial. Trial was held on July 11, 12, 13 and 19, 1994. At trial, the following parties and attorneys appeared: Joseph Q. Adams, Trustee, and his attorney Steven J. Adams; Margaret Keeling, plaintiff, and her attorney Phyllis A. Dewitt; Steven K. Balman, attorney for plaintiffs Lee Keeling, Columbia Development Corporation and Savannah Investment Company; and defendant Erhan Ozey and his attorney J. Philip Adamson. After trial, the matters were taken under advisement. Upon consideration of the record herein, the Court, pursuant to F.R.B.P. 7052, now finds, concludes, and orders as follows.

These actions involve matters of mixed fact and law, wherein it is sometimes difficult to separate "Findings of Fact" from "Conclusions of Law." The Court recites evidentiary facts, comments on the weight of evidence and credibility of witnesses, and determinations of mental state, in its "Findings of Fact;" and relates such matters to the appropriate statutes in its "Conclusions of Law."

## FINDINGS OF FACT

Erhan Ozey ("Erhan;" "debtor") is the son of Turkish parents, namely Dundar Ozey ("Dundar") and Dundar's first wife Necla Ozey ("Necla"). Dundar was a businessman, majority stockholder and chief executive officer of a Turkish corporation known first as Ticaret and later as Ersan Makina Corporation ("Makina Corp."). Makina Corp. has produced substantial sums of money for its owner and CEO.

Erhan was raised in Turkey, but there attended an English-and-Turkish-speaking school and was bilingual in English and Turkish when he graduated from high school. In 1970, Erhan traveled to the United States for his college education, and enrolled at the University of Oklahoma. He earned two degrees, a bachelor's degree in petroleum engineering, awarded in 1972, and a master's degree in chemical engineering, awarded in 1975. During this time, he married Funda Ozey ("Funda"), herself a Turkish student at the University of Oklahoma who majored in English literature. After graduating from college, Erhan worked in the United States for Cities Service Company in the petroleum and chemical engineering fields. In 1980, Erhan left Cities Service Company and went to work for Lee Keeling and Associates Company, whose principal was Lee Keeling ("Keeling"). Erhan developed special expertise in computer programming and statistics unique to the oil industry.

In July 1983, Erhan divorced Funda. In April 1984, Erhan married Keeling's daughter Margaret ("Margaret"). From 1984 through 1991, Erhan conducted various business ventures involving Keeling and Margaret regarding oil, leather, and yachts.

Regarding oil: In 1984, Erhan and Keeling formed two new corporations, Concepts International Corp. ("Concepts I") and Concepts Development Company ("Concepts II"). Lee Keeling and Associates Company owned Concepts I, which in turn owned Con-

cepts II. Erhan became president and chief operating officer of Concepts I and II. The Concept companies were in the business of creating and selling computer software and services. The Concept computer programs concerned oil and gas operations, and were designed to be used by speakers of English. In 1986, Keeling, Margaret and Erhan formed a third new business entity, named Atnas Resources, Inc. ("Atnas Inc."), whose business was oil and gas exploration and production. So far as appears from this record, Concepts I and II and Atnas Inc. were all inactive by the end of 1991.

Regarding leather: In 1988, the Keeling interests and the Ozey family joined forces to conduct international trade in leather goods. Erhan and his father-in-law Keeling formed a corporation called Anatolia Inc., which later changed its name to Emstar USA, and is hereinafter called "Emstar Inc." Erhan and his natural parents Dundar and Necla formed a Turkish corporation, Ersan Deri ("Deri Inc."). These entities dealt with each other according to the following pattern (whose occasional variations are not material here). Emstar Inc. would obtain money from Keeling and some of Keeling's other business entities, in particular Columbia Development Corporation ("Columbia Corp.") and Savannah Investment Company ("Savannah Co."). Emstar Inc. would advance this money to Deri Inc. Deri Inc. would use the money to buy unworked leather, and would manufacture it in Turkey into finished leather goods. Deri Inc. would then transfer the finished goods to Emstar Inc., which would market them in the United States. From 1988 through late 1991, Keeling and his affiliates Columbia Corp. and Savannah Co. advanced at least $6 million to Emstar Inc., which in turn advanced it to Deri Inc. The value of goods which Deri Inc. manufactured and shipped in return was much less— around $2.6 million less. The deficiency is said to have been caused by errors of judgment, such as making extensive purchases of pigskin which Deri Inc.'s Muslim leatherworkers refused to touch. Emstar Inc. never showed a profit. It did show an account receivable due to it from Deri Inc. in the amount of $2.6 million. On June 1, 1991, Erhan executed (on Deri Inc.'s stationery) a document titled "Agreement and Waiver," which purported to convey to Necla any interests Erhan might have in property in Turkey—an act, not only of filial devotion, but of self-interest in the face of impending financial adversity. In November 1991, Keeling and his affiliates decided to cut their losses. After negotiation and compromise, these losses were set at $1 million; Emstar Inc. acknowledged its debt in that amount to Keeling, Columbia Corp. and Savannah Co.; and such debt was guaranteed by Erhan personally.

Regarding yachts: Dundar maintained one or more yachts, which he "documented [i.e. titled and registered] in the United States in order to avoid a 150–160% tax imposed on Turkish yachts in Turkey, ensure safer and easier travels in the Mediterranean and avoid disclosure of his sources of income to Turkey." One of these yachts, valued at $500,000 to $800,000, was named the "Ersan." In 1989, Dundar and son Erhan incorporated Ersan Resources, Inc. ("Ersan Inc.") to act as corporate owner of the yacht "Ersan." The company's original stockholders were Dundar, as minority stockholder, and Erhan's wife Margaret, as majority stockholder. The yacht was berthed in Turkey; and Margaret gave Dundar a power of attorney which effectively lodged control of the yacht in Dundar. This arrangement "was satisfactory at the time to all parties involved." But in November 1991, Dundar was hospitalized and was temporarily unable to manage his business affairs. He gave a power of attorney to his wife Necla, who used it to transfer Dundar's interest in Ersan Inc. to their son Erhan. Dundar did not approve. Neither his wife nor his son were welcome to meddle with his yacht.

In January 1992, Margaret and Erhan were divorced. The divorce decree required Erhan to make various payments in property division and for the support of Margaret and her two children by Erhan; and awarded Erhan all interest in and to Atnas Inc., Emstar Inc., and Ersan Inc.

In March 1992, Erhan as principal of Atnas Inc., Emstar Inc. and Ersan Inc. caused these entities to rent office space in the

Kensington Towers, a large office building in Tulsa, Oklahoma. Atnas Inc. was inactive. Ersan Inc. held a valuable but unremunerative and unliquidated property (the yacht) whose upkeep cost money—there were berthing and maintenance expenses, and an insurance premium of $7,500 per year which Erhan paid from his personal funds (whose source will be discussed below). Emstar Inc. had been active but never profitable, and was now deeply in debt to Keeling and his affiliates. By August 1992, Emstar's business had so far declined that Erhan let go all of its employees, save himself and one Robin Hoel ("Robin"). By the end of 1992, Emstar had ceased doing any new business. Rent due on the Kensington Towers leases was paid by Erhan from his personal funds (whose source will be discussed below). Books and records for these corporations had been kept in adequate detail until about this time; but thereafter, corporate record-keeping became inadequate and uninformative.

Although his businesses were failing and his Turkish property had been conveyed to his mother, Erhan had a source of income. Late in 1991, Necla began providing Erhan with an allowance of $5,000 to $15,000 per month, with additional allowances for special purposes. According to Erhan, these cash allowances were "gifts" to the extent of $5,000 per month and "loans" to the extent greater than $5,000 per month. Erhan himself determined how the money "given" or "loaned" to him by Necla should be spent. Necla's advances to Erhan have continued from late 1991 to the present. They did not terminate, or even much diminish, when Necla and Dundar divorced late in 1992. According to Erhan himself they total more than $2.8 million.

Some of this money was used for Erhan's ordinary living expenses. Some of it was used to pay the rent on the Kensington Towers office space, and for other business purposes. In December 1992, $77,000 of it was used to make a down payment on a $277,000 home which Erhan bought at 9910 South Sandusky Avenue in Tulsa, Oklahoma. The balance of $200,000 was financed by Bank IV ("the Bank"). Erhan's application to the Bank for this loan stated that his assets included $90,000 in cash and ownership of businesses worth $700,000; and that his liabilities consisted only of a few credit card and revolving-account debts—with no prior foreclosures, unsatisfied judgments, or outstanding undisclosed notes or guarantees, endorsements or co-debts on notes. Erhan specified that his down payment on the home was not borrowed. The Bank did not rely on Erhan's application in deciding to make the $200,000 loan.

At the time of this purchase, i.e. on December 15, 1992, Erhan was a single man. But in February 1993, Erhan married his former employee Robin. Since then, Erhan, Robin, and Robin's daughter Amanda have resided in this house and have made it their home. At about the same time, Erhan's father Dundar also remarried, to one Solmaz Ozey ("Solmaz"). Although details are obscure, it appears that Dundar placed some, most, or all of his property in Solmaz' name.

In March 1993, the corporate leases of Atnas Inc., Emstar Inc. and Ersan Inc. at Kensington Towers expired. They were not renewed. Ozey moved the corporate offices into his home, and from there continued collecting or trying to collect corporate accounts receivable.

In April and August 1993, Erhan applied for life insurance policies in total amount of $1 million naming Robin as beneficiary. Premium payments on these policies totalled $774 per month. One of Erhan's applications stated that he was employed by Emstar Inc. as an engineer and "leather-mfg. operator" and had a net annual income of "50,000 +". The other stated that he was employed by Emstar Inc. and Ersan Inc. as an "oil and gas consultant."

In mid–1993, Erhan defaulted on his commercial obligations to Keeling and affiliates, and on his property division and support obligations to Margaret. Keeling and affiliates sued on their notes and guarantees; and Margaret initiated a contempt action on the divorce decree in the District Court of Tulsa County, Oklahoma. In the course of discovery in the contempt action, Erhan testified, among other things, that he owned part or all of Deri Inc. The contempt action went first to judgment. Erhan was held in contempt;

and on September 9, 1993, Margaret enforced the contempt judgment by garnishing Erhan's checking account and seizing $6,992.82. On September 23, 1993, Erhan "notarized" (i.e., filed or recorded) in Turkey two documents, one called "Mutual Undertaking" dated May 18, 1992, the other called "Minutes of Precaution" dated April 24, 1993, both of which purported to convey to Necla whatever interest Erhan may have had in Ersan Inc. Meanwhile, Necla ceased making monthly "gifts" and "loans" to her son Erhan, and commenced making monthly "gifts" and "loans" by wire transfer to the separate account of her son's new wife Robin. Robin has testified that these cash allowances are "gifts" to the extent of $5,000 per month and are "loans" to the extent greater than $5,000 per month. From September 1993 to date, such "gifts" and "loans" total more than $90,-000.00. These monies have been used to pay joint expenses of Erhan and Robin, or in commercial transactions in which Robin has no obvious interest. For example, in late 1993 payment was made from Robin's account of $14,574.00 for a refinery compressor; the compressor went to a Turkish company which paid Robin $15,578.00 for it. Erhan admits that Necla transferred her "gifts" and "loans" from Erhan to Robin to shield the monies from Margaret's efforts to enforce her contempt judgment by garnishment. The action on the debts and guarantees went to judgment on November 2, 1993. Keeling and affiliates were awarded $1 million plus interest and costs against Emstar Inc. and Erhan personally.

· Meanwhile, Dundar had possession of the yacht "Ersan," but did not have title to it. Dundar sued Ersan Inc. and his son Erhan in the United States District Court for the Eastern District of Virginia, to determine who owned the yacht. By order dated January 19, 1993 (which is incorporated herein by reference, and a copy of which is appended hereto), the Honorable J. Calvitt Clarke determined that the yacht was owned by Ersan Inc. (and therefore effectively by Erhan). Disgruntled, Dundar filed a second suit in Turkey, asking the Turkish court to determine who owned the yacht—and disregarding Judge Clarke's prior determination of the same issue. The Turkish court heard the

case, but ruled as Judge Clarke had already ruled, i.e. that the yacht was owned by Ersan Inc. (and therefore effectively by Erhan). Doubly disgruntled, Dundar appealed the Turkish judgment. Meanwhile, on Erhan's motion, Judge Clarke held Dundar in contempt, ordered him to dismiss the Turkish proceedings, and assessed damages in contempt of $172,000. Dundar was still in contempt of Judge Clarke when a Higher court intervened.

On about November 10, 1993, Dundar died. Erhan went to Turkey for his father's funeral. He also claimed his inheritance. On November 17, 1993, Erhan requested and obtained in the Turkish court a "Determination of Heirship." Next day, November 18, 1993, Erhan executed a general power of attorney in favor of one C. Mujdat Bali ("Bali"). Bali had been a friend, confidant, advisor and attorney for the Ozey family (which must have been a delicate business after Dundar fell out with Necla and Erhan). Bali's formal appointment as attorney for Erhan was a necessary preliminary to the following: on the same day, November 18, 1993, Bali as attorney for Erhan filed in the Turkish court a "Request for Keeping a Book ..." which launched the Turkish equivalent of administration of Dundar's estate. In the ensuing case, Bali continued to act, and in pleadings and court orders was expressly and repeatedly identified, as Erhan's attorney.

Erhan returned to the United States. Margaret was still trying to enforce her divorce decree. Keeling and affiliates had recorded their million-dollar-plus judgment on November 17, 1993 (the same day that Erhan had asked the Turkish court for a "Determination of Heirship"). As Dundar's heir apparent, Erhan found himself technically liable to pay Judge Clarke's $172,000 fine—although Erhan, in his other capacity as principal of Ersan Inc., had asked for imposition of the fine in the first place! And now, a demon lurking in the background came forward. Turkish tax authorities impounded the yacht "Ersan," pending determination of their claim for yacht-taxes which Dundar had been dodging these many years. Since two courts, one American and one Turkish, had

already declared that this yacht was not Dundar's, the Turkish tax authorities' theory that Dundar owes taxes which follow this yacht is highly disputable.

On December 30, 1993, Erhan filed his voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court. Joseph Q. Adams was appointed and continues to serve as Trustee ("the Trustee") of Erhan's bankruptcy estate.

With his petition, Erhan filed statements and schedules purporting to report his current assets and liabilities and recent financial history. These documents were submitted under penalty of perjury. They report assets worth $295,500 and debts totalling $4,833,940.65.

The reported assets consisted of Erhan's home at 9910 South Sandusky Ave. in Tulsa, valued at $275,000.00; household goods and clothing valued at $9,000; and one automobile valued at $2,500.00. All were claimed exempt under 11 U.S.C. § 522, 31 O.S. § 1. Erhan listed bank accounts but reported zero funds in them; listed two life insurance policies, but valued both at zero; listed a "consulting fee claim" owed to him by Concept I, but valued it at zero; listed a "Contingent Interest in Estate of Dundar . . .," but valued it at zero; and listed ownership of stock in Atnas Inc., Emstar Inc. and Ersan Inc., but valued it at zero. These reported assets and claims of exemption indicated to the Trustee, and would have indicated to any creditor consulting Erhan's statements and schedules, that no assets would be available for distribution to creditors in this bankruptcy case.

The reported liabilities included priority claims of $9,241.00; secured claims of $3,057,627.16; and non-priority unsecured claims of $1,767,072.49. The largest single claim of any type was reported to be a claim in the amount of $2,853,370.00 owing to Necla for "Loans and guarantees" and secured by a "possessory lien 05/18/92 on stock of Ersan . . . Inc."

No mention was made in any of these documents that Erhan had employed or engaged Bali as his attorney in the Turkish decedent-administration case.

The day *after* he filed bankruptcy, Erhan executed a series of notes from himself, Erhan Inc. and Emstar Inc. to Necla, in total amount of between $250,000 and $300,000. Within the next day or two, he also resumed contact with Bali concerning the Turkish proceedings on Dundar's estate and Erhan's inheritance.

On January 24, 1994, Erhan appeared at the meeting of creditors held pursuant to 11 U.S.C. § 341 ("the meeting of creditors"), and testified under oath pursuant to 11 U.S.C. § 343. Erhan stated that he had notes and guaranties in favor of Necla which "total[led] up" to $2.8 million; that Necla's wire transfers of money were made to "an account [Erhan] can sign on;" and that he was unfamiliar with Turkish proceedings on the death of his father Dundar, and in particular did not know "who acts or how the [Turkish] court takes notice of the death."

The Trustee gave no authority of any nature whatsoever to Erhan or Erhan's agents to effect any activity in the Turkish courts concerning administration of Dundar's estate or Erhan's inheritance therefrom. But in late February 1994, the Trustee was informed by letter that Erhan and Solmaz had "declared their intention to resolve the dispute between themselves and asked for a continuance" of hearing in the Turkish decedent-administration case; and that a continuance was granted to March 31, 1994. In mid-March 1994, Erhan traveled again to Turkey. On March 24, 1994, the Trustee sued Erhan in this Court to enjoin him from taking any steps to effect disposition of his Turkish property, including any inheritance from Dundar. The Trustee obtained a temporary restraining order and then a preliminary injunction. But on March 31, 1994 (the same day the Trustee's preliminary injunction was granted), Erhan's and Solmaz' attorneys appeared in the Turkish court and jointly dismissed the decedent-administration case. Erhan later testified that he did not know of the entry of the preliminary injunction in time to stop the dismissal of the Turkish case. Later, in May 1994, Erhan stipulated to the entry of a final injunction against himself.

In the course of Erhan's bankruptcy case, the Trustee and various creditors objected in part to Erhan's claim of exemption of his home. The Court incorporates herein by reference its "Order Denying Objections to Debtor's Homestead Exemption" of even date herewith. In that proceeding, it appeared that Erhan had taken into his home some equipment, including a copier and facsimile machine, which had come from the offices of Atnas Inc. and/or Emstar Inc. and/or Ersan Inc. No suggestion appeared that this equipment belonged to anyone other than Erhan himself or his corporations.

In the course of Erhan's bankruptcy case, the Trustee and various creditors also objected to Erhan's discharge. The various objections to discharge were consolidated for trial.

At trial, Erhan testified, *inter alia,* as follows:—that the $2.6 million account receivable which Deri Inc. owed to Emstar Inc. represented an actual debt of only $300,000 to $400,000;—that Erhan did not own and never had owned any interest in Deri Inc.;—that the copier and facsimile machine had been sold to Necla and did not belong to him or to his corporations;—that no documentation existed for the amount of Necla's $2.8 million claim beyond the extent of $250,000 to $300,000 in notes executed after bankruptcy;—that no documentation existed for any security agreement or lien securing any part of Necla's claim;—that Necla ceased "giving" or "lending" money to Erhan, and commenced "giving" or "lending" money to Robin, for the purpose of shielding such allowances from Erhan's creditors, in particular from Margaret;—that he did not report in his bankruptcy statements and schedules that Bali was his attorney in Turkey, because he did not understand that he had "employed" or "engaged" Bali, as a matter of English usage;—and that Erhan had no personal knowledge of the entry of this Court's preliminary injunction on March 31, 1994, in time to prevent dismissal of the Turkish decedent-administration case on that same day.

At trial, Emstar's own accountant Mike Gray testified that the $2.6 million account receivable which Deri Inc. owed to Emstar Inc. was carried, to all appearances legitimately and in the normal course of business, on Emstar's books. Accountant Brad Grow testified that this account receivable was "unaccounted for" and that there was no evidence that it had been paid down to $300,000 or $400,000.

Erhan's attorney argued that Erhan was caught between two legal systems and suffered from his inadequate knowledge of English. The Court finds that Erhan's Turkish extraction put him at no disadvantage: he is fluent in English, is an intelligent professional person and a sophisticated international businessman, and knows as much about both Turkish and American legal systems as one might expect any Turkish or American layman to know.

Erhan's testimony includes some admissions against interest, e.g. that Necla's alleged secured claim of $2.8 million cannot be documented, and that Necla's "gifts" and "loans" were deliberately steered away from Margaret's execution efforts. More often, however, Erhan in his testimony before this Court did not answer questions clearly, concisely or directly. Erhan showed himself fluent in English and capable of understanding questions and of framing answers; but those answers were permeated by evasiveness.

Nor is "evasiveness" Erhan's only weakness. Erhan's various assertions in pre-bankruptcy documents, in his bankruptcy statements and schedules, and in his testimony at the meeting of creditors and in hearings before this Court, are often inconsistent with each other and with other evidence. These inconsistencies include the following:—an account receivable of $2.6 million carried on Emstar Inc.'s books, later said to be in the true amount of only $300,000 to $400,000;—Erhan's statement to Bank IV that his net worth included corporations worth $700,000 (a fair estimate of the value of Ersan Inc.'s yacht plus some of Emstar Inc.'s accounts receivable), versus his bankruptcy schedules valuing the same property at zero;—Erhan's statement to Bank IV that his down payment on his home was not borrowed, versus his statements to this Court that money for this payment was borrowed from Necla;—Erhan's statements to insurance companies that he was employed as an

engineer with an income of over $50,000 a year, at a time when his consulting business had long been inactive, his leather business had failed, and according to his later testimony before this Court he had no income of his own at all except "gifts" and "loans" from Necla;—Erhan's pre-bankruptcy statements he owned part or all of Deri Inc., versus his statements during his bankruptcy that he never owned any part of Deri Inc.;—Erhan's declarations, or omissions equivalent thereto, during his bankruptcy to the effect that he had no attorney in Turkey dealing with Dundar's estate, when Bali was acting for him for this very purpose;—Erhan's statements to this Court that he was unfamiliar with Turkish proceedings dealing with Dundar's estate, when he had personally commenced such proceedings in Turkey after Dundar's funeral;—Erhan's declarations, or omissions equivalent thereto, during his bankruptcy to the effect that business equipment in his home was owned by him through Atnas Inc., Emstar Inc. and/or Ersan Inc., versus his statement to this Court that this equipment had been sold to Necla and did not belong to Erhan or his corporations. It is not always clear which of two or more inconsistent statements is false, and in what degree; but it is perfectly clear that at least some, if not all, of such statements must be false. The very lack of certainty has been created by the multiplicity of inconsistencies. The cumulative effect of these irreconcilable inconsistencies is to destroy Erhan's credibility as a witness.

Moreover, Erhan's misstatements and omissions, acts and failures to act, show a definite pattern. That pattern is one of self-interest. Erhan's admissions against interest occurred during the trial of these adversary proceedings; these admissions are significant, but they do not obliterate the broad pattern of self-interested inaccuracy and self-interested inconsistency established by Erhan's many other acts and omissions. Erhan omits or undervalues assets when it is to his own advantage to do so; and he claims ownership of valuable assets when it is to his own advantage to do so. This pattern indicates that Erhan's inconsistent statements, misstatements, acts and omissions are not inadvertent. Rather, they are calculated and intended to deceive.

Erhan's attempts to excuse or mitigate his derelictions are unconvincing. A few examples will suffice. Regarding the value of his corporations: Outside bankruptcy, Erhan valued Ersan Inc. and its yacht "Ersan" at a sum approaching $700,000; yet in bankruptcy, Erhan valued them at zero. By then, the yacht had been claimed by Turkish revenue agents; yet such claim was highly disputable, and the mere unresolved existence of such a claim does not justify scheduling Ersan Inc. at so low a value. Regarding Erhan's unauthorized pursuit of his inheritance from Dundar: Erhan testified that he did not know of the entry of a preliminary injunction on March 31, 1994 in time to prevent dismissal of the Turkish decedent-administration case on the same day. He did not explain how he could have allowed his attorney to dismiss the Turkish case *at any time*, in face of a temporary restraining order which had been entered a week earlier, and which was still in force when it was succeeded by a preliminary injunction; nor did he explain why he did not instruct his attorney to vacate the dismissal when he learned of the preliminary injunction. Later, Erhan stipulated to the entry of a final injunction against himself. But such stipulation cost Erhan nothing, since he and Solmaz had already settled the Turkish administration to their own satisfaction. In effect, Erhan agreed to close the barn door after he had already stolen the horse.

### CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (J), 11 U.S.C. § 727(a).

■ The Trustee, Margaret, and Bank IV object to Erhan's discharge under 11 U.S.C. § 727(a)(2)(A), (B), (3), (4)(A), (B) and (5). The burden is on these objectors to prove grounds for denial of discharge by a preponderance of evidence, *In re Serafini*, 938 F.2d 1156 (10th Cir.1991).

■ From the facts found above, it is not only probable but clear that Erhan's discharge must be denied under § 727(a)(2)(A), (B), (3), (4)(A), (B) and (5).

Erhan has diverted or connived at diverting money to his wife's account, without relinquishing his own effective ownership of it, with the admitted intention of hindering Margaret's attempts to execute on such mon-

ey. He has attempted to conceal his interest in collectible accounts receivable, in some business equipment, in a yacht which may be worth well over half a million dollars, and in an inheritance from the estate of an affluent and successful businessman. He has actively attempted to obstruct the Trustee, and/or to dispose of property in which the bankruptcy estate has an interest, by his activities regarding the inheritance which is property of the estate under 11 U.S.C. § 541(a)(1), (5)(A); and by his post-petition attempts to commit Emstar Inc. and Ersan Inc. to additional "secured" debt in favor of Necla. He has misrepresented his financial position, so that he appears solvent, or at least gainfully employed and adequately salaried, when it is to his own advantage to appear so, yet appears hopelessly insolvent, without any assets of value to his general creditors and bankruptcy estate, when it is to his own advantage to appear so. The pattern of self-interest that appears in such statements, acts and omissions supports, and indeed compels, the inference that such statements, acts and omissions were made and done "knowingly and fraudulently." These matters satisfy the requirements for denial of discharge under 11 U.S.C. § 727(a)(2)(A) and (B). Further, many of Erhan's knowing and fraudulent misrepresentations were made under oath, either in deposition, in testimony before various courts, or in verified bankruptcy statements and schedules. This satisfies the requirements for denial of discharge under § 727(a)(4)(A), *In re Calder,* 907 F.2d 953, 955–956 (10th Cir.1990); *Farmers Co-op Ass'n v. Strunk,* 671 F.2d 391, 395 (10th Cir.1982). Further, Erhan asserted the existence of a "secured claim" of $2.8 million in favor of Necla, and attempted to use it to discourage inquiry by the Trustee into the potential value of Ersan Inc. and its yacht, when Erhan must have known that said claim could not be substantiated. This satisfies the requirements for denial of discharge under § 727(a)(4)(B). Further, Erhan has failed to keep, or else has concealed, books and records from which his true financial position, including the recent value of his interest in his corporations Atnas Inc., Emstar Inc. and Ersan Inc., could be determined. Because of Erhan's machinations, it remains unclear to this moment just what property is or should be included in his bankruptcy estate, how much it is worth, and what claims it may be subject to. This satisfies the requirements for denial of discharge under § 727(a)(3). Finally, Erhan has failed to give satisfactory explanation of a deficiency of assets to meet his liabilities—in particular how and why he came to convey his property to his mother, receive regular income from her on his demand, and freely spend such income for his own benefit and even personal luxury, during the same period in which his businesses were failing and he was defaulting on obligations owed not only to his business partners but even to his children. This satisfies the requirements for denial of discharge under § 727(a)(5).

Plaintiffs have proven, not only specific instances of misconduct, but a pervasive pattern of dishonest obstruction of the legitimate interests of creditors and Trustee. Under such circumstances, the bankruptcy discharge, which is intended to benefit "honest but unfortunate" debtors who in good faith have tendered "the price of discharge," *In re Spoor–Weston, Inc.,* 139 B.R. 1009, 1013 (Bankr.N.D.Okl.1992), aff'd 13 F.3d 407 (10th Cir.1993), cannot be granted to Erhan.

Accordingly, plaintiffs' complaints are sustained on their merits; and debtor Erhan Ozey's discharge must be and is hereby denied. Judgment shall issue in conformity herewith.

AND IT IS SO ORDERED.

## APPENDIX A

In the United States District Court

for the Eastern District of Virginia

Norfolk Division

Ersan Resources, Inc., Plaintiff,

v.

Zita King Kiratli, Defendant, and

Dundar Ozey, Defendant and Third–Party Plaintiff,

v.

Erhan Ozey, Third–Party Defendant.

Civil Action No. 2:92cv464

*ORDER*

This matter is before the Court on the Complaint of Plaintiff, Ersan Resources, Inc.

("Ersan Resources"), asking this Court to 1) declare Ersan Resources the lawful owner of the motor yacht ERSAN; 2) grant judgment against the defendants Zita King Kiratli and Dundar Ozey for their fraudulent attempts to deprive the plaintiff of its vessel; 3) award punitive damages against them for their fraudulent attempts to deprive the plaintiff of its lawful title and possession to the ERSAN; and 4) grant a permanent injunction against them prohibiting them from interfering with the plaintiff's title and possession of the yacht ERSAN. For the reasons set forth below, the Court FINDS Ersan Resources to be the owner of the ERSAN and enters a permanent injunction against defendants from interfering with plaintiff's ownership and use of the ERSAN.

## FACTS

This case concerns the ownership of a 65′ long range cruiser, the ERSAN. After hearing three days of trial testimony and argument on the fourth day, weighing the credibility of witnesses and considering the memoranda and exhibits filed in this case, the Court makes the following findings of fact and conclusions of law. In 1985, Hatteras Yachts, Inc., located in New Bern, North Carolina, built the ERSAN [1] for Ersan Ticaret, Ltd. ("Ersan Ticaret"), a Turkish corporation which is 100% owned by Dundar Ozey ("Dundar"). On March 4, 1986, Dundar, as president of Ersan Ticaret, transferred 100% interest in the ERSAN to Zita King Kiratli ("Zita"), a U.S. citizen, in order to obtain a U.S. registry for the yacht.[2]

Zita then obtained a Certificate of Documentation from the U.S. Coast Guard in Nor-folk, Virginia, by certifying that she was the sole owner of the ERSAN and a U.S. citizen. The Coast Guard assigned the ERSAN an official number, 694248. In support of the application for documentation Zita filed a Certificate of Marking stating the vessel's name as the ERSAN and that its hailing port, Baltimore, Maryland, had been painted on the vessel.[3] A picture of the vessel introduced in evidence showed the absence of a hailing port painted on the vessel. There is also evidence that these markings were removed from the yacht.[4]

On May 15, 1986, Zita gave Dundar a power of attorney which gave him "all powers, discretions, elections and authority to sell, convey, lease, exchange, mortgage, pledge, release, hypothecate, or otherwise deal with, dispose of, exchange or encumber [the] yacht." Exhibit ("Ex.") 13. On January 29, 1989, pursuant to this power of attorney and without notice to Zita, Dundar sold the ERSAN to Orada, Ltd. ("Orada"). Orada then registered the ERSAN in Great Britain. On May 25, 1989, after learning of this sale, Zita wrote to the Norfolk Coast Guard as the "former owner" of the ERSAN requesting it to cancel the Norfolk documentation.

In 1989, Dundar ordered a new 65′ yacht, the ERSAN V, to replace the one sold to Orada. In order to obtain U.S. documentation for the yacht, Dundar and his son, Erhan Ozey ("Erhan") incorporated Ersan Resources, Inc. ("Ersan Resources") in Oklahoma on June 28, 1989, "to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Oklahoma," Ex. 4,

---

1. Its hull number is 65LR312, and its hull identification number is HATBX312K586.

2. Dundar kept his yachts at the Kusadasi Marina in Turkey. The evidence is clear that Dundar documented his yachts in the United States in order to avoid a 150–160% tax imposed on Turkish yachts in Turkey, ensure safer and easier travels in the Mediterranean and avoid disclosure of his sources of income to Turkey. Trial testimony further indicated that Dundar had paid for the yacht from a Swiss bank account.

3. The official number is required to be "permanently marked in block-type arabic numerals not less than three (3) inches in height on some clearly visible interior part of the hull and that number cannot be obliterated or obscured." Certificate of Marking at TE 2 & 3. The name and hailing port must be "marked together in clearly legible and durable letters not less than four (4) inches in height on a clearly visible exterior part of the hull." Id.

4. Nonetheless, the Court finds it unnecessary to determine in this case whether the hailing port had ever been painted on the boat as Zita certified.

and to own the ERSAN V. Dundar originally thought Ersan Resources would also be an operating corporation engaged in both international trade and trade in Oklahoma. At the first corporate meeting, Margaret Keeling Ozey ("Margaret", Erhan's then-wife) was elected director, president and chief executive officer of the corporation, Erhan was elected vice president and Linda Lipka was elected secretary. The corporation issued 800 shares of stock to Margaret in exchange for $800 and 200 shares to Dundar in exchange for $200 and "all right, title and interest in and to a motor yacht at a book value to be later determined." Ex. 4.

On Dundar's instructions Hatteras Yacht, Inc. then conveyed the ERSAN V[5] to Ersan Resources who obtained a Certificate of Documentation from the U.S. Coast Guard in St. Louis, Missouri, certifying that it owned the ERSAN V and that Margaret, its president and chairman of the board, was a U.S. citizen and owned at least 75% of Ersan Resources' stock. Margaret signed the application for documentation and the marking certificate on behalf of Ersan Resources as its president. Pursuant to this information and a Certificate of Marking filed by the corporation, the Coast Guard assigned the ERSAN V an official number, 955523, and issued its Certificate of Documentation setting forth the vessel's name as ERSAN V and its hailing port as St. Louis, Missouri.

In June of 1990, pursuant to a power of attorney given by Ersan Resources and signed by Margaret as its president, Dundar traded the ERSAN V with Orada for the ERSAN plus $200,000. Accordingly, on September 28, 1990, Orada gave Ersan Resources a bill of sale for the ERSAN. Thereafter, Ersan Resources applied to the St. Louis Coast Guard for a Certificate of Documentation for the ERSAN relying on the ERSAN's British registry and the bill of sale. Again Margaret Keeling represented to the Coast Guard that she was Ersan Resources' director, president and chairman of the board, a U.S. citizen, and owned at least 75% of Ersan Resources' stock and that the hailing port was properly painted on the hull. Consequently, the Coast Guard in St. Louis issued a Certificate of Documentation for the ERSAN with a new official number, 973155, and new measurements.[6]

Zita's ownership of the ERSAN and Ersan Resources' ownership of the ERSAN V and later the ERSAN was satisfactory at the time to all parties involved. Dundar abided by and benefited from this arrangement for two years. Because of the U.S. documentation of the vessels, he avoided exorbitant Turkish taxes and was able to travel securely in and out of ports in the Mediterranean. In order to use the yachts he obtained powers of attorney from both Zita (for the ERSAN) and Margaret (for the ERSAN V and the ERSAN). Moreover, Ersan Resources was a lawful corporation; it complied with all formalities of law in maintaining its corporate existence.[7] It had annual meetings and paid its franchise fees and taxes. Dundar, however, paid for all the maintenance and other expenses and the insurance for the yachts until this ownership dispute developed.

It was not until November of 1991 that affairs began to sour. Two events occurred which apparently precipitated the present litigation. Dundar was hospitalized for his diabetes. Thus, he gave his then-wife, Necla Ozey ("Necla"), a General Power of Attorney so that she could run his business affairs. However, their marriage was having problems, and thereafter Necla transferred Dundar's 20% interest in Ersan Resources to Erhan.[8]

Erhan too was having marital difficulties. On January 14, 1992, he and Margaret divorced. Their property was divided along family lines and pursuant to a prenuptial

---

**5.** Its hull number is 65MY318, and its hull identification number is HATDL318F989.

**6.** Neither Margaret nor the St. Louis Coast Guard knew of the prior Norfolk registration.

**7.** Dundar however refused to disclose the value of the yachts to the corporation. Accordingly, they could not be placed in the corporate records.

**8.** The Court finds it unnecessary to determine whether the transfer arose out of the marital difficulties or some other reason.

agreement; each basically received what he/she brought into the marriage. Since Ersan Resources was formed during their marriage and thus was not included in the prenuptial agreement, they agreed that the stock in the corporation would go to Erhan. Accordingly, this agreement was made a part of the divorce decree issued by the Oklahoma court. Although Margaret assigned her 80% interest to Erhan, she did not note his name on the stock certificate in what she termed an "open" assignment. Margaret then gave notice of her resignation as president from Ersan Resources in what she termed an "open letter of resignation." She was aware at the time she endorsed the stock certificate in blank and wrote the letter of resignation that there were reasons why the stock would not be transferred immediately and the letter of resignation would not be accepted immediately. She further knew that the date of Erhan's naturalization as an American citizen was the determinative factor in when the transfer and acceptance of the stock and letter of resignation respectively would take place.

On February 14, 1992, Erhan was elected president and became a U.S. citizen. On that same date Ersan Resources issued the stock certificate in Erhan's name. It was only after the family upheaval, a consequence of which Erhan obtained 100% of the stock in Ersan Resources, did Dundar challenge the corporate ownership of the yacht.

During Dundar's hospitalization, Ersan Resources hired a captain, Ali Hayta, to maintain the ERSAN. On March 9, 1992, it paid all the accrued marina and maintenance fees and insurance for the yacht and has continued to do so to date. Nonetheless, once Dundar recovered, he brought suit against his wife to invalidate her power of attorney. Necla however voluntarily rescinded it.[9] Dundar also had Hayta removed from the ERSAN. Consequently, Erhan attempted to take possession of the ERSAN using the St. Louis documentation to show that Ersan Resources owned it. Since the

marina manager knew Dundar, he declined to accept Erhan's representation of ownership. Erhan then instituted proceedings in the Turkish courts to establish title to the yacht in the name of Ersan Resources.

Dundar intervened in the Turkish suit first claiming that he was the owner of the yacht pursuant to a British registry. When this argument failed, he directed Zita Kiratli, in May of 1992, to redocument the ERSAN with the Norfolk Coast Guard. On May 12, 1992, Zita had the ERSAN's Certificate of Documentation reinstated by notifying the Coast Guard in Norfolk that the 1989 sale to Orada had fallen through. Again she certified that she was a U.S. citizen who owned 100% of the yacht. No mention was made of the ERSAN's documentation in Missouri. Dundar returned to the Turkish court with this certification claiming that Zita was the owner of the ERSAN, he had a power of attorney from her, and he thus should be given possession of the yacht.

Upon the request of the harbor master in Kusadasi, Turkey, the Norfolk Coast Guard informed him that the ERSAN was documented both in Norfolk, Virginia with an official number 694248, and in St. Louis, Missouri, with an official number 973155. It further noted that the ownership of the ERSAN was disputed thus requiring a U.S. court decision of ownership. Based on this information, the Turkish court declined to determine ownership until the controversy in the United States was resolved. The Turkish proceedings were continued until January 22, 1993, presumably to give this Court an opportunity to determine ownership of the vessel which is under U.S. registry.

On June 18, 1992, Ersan Resources filed a Complaint against Zita in this Court alleging therein that it is the lawful owner of the motor yacht ERSAN. It traces its chain of title back to the trade of the ERSAN V with Orada for the ERSAN. On July 8, 1992, Ersan Resources asked this Court for an injunction to prevent Zita or anyone acting on her behalf from taking possession or other action against the ERSAN until this Court

---

9. There is no evidence that Dundar has brought any proceedings in Turkey or Oklahoma challenging the transfer of the 20% stock in Ersan Resources to Erhan pursuant to Necla's power of attorney.

ruled on the ownership of the yacht. This temporary injunction was granted on July 16. On July 14, 1992, Zita filed an Answer stating she is the lawful owner of the ERSAN. She denies Ersan Resources' ownership by claiming that the first sale of the ERSAN by Ersan Ticaret to Orada and the trade from Orada back to Ersan Resources were not lawful. Specifically, she argues that the bill of sale transferring the ERSAN to Orada from "Dundar Ozey by Ersan Ticaret, Ltd" did not transfer title to Orada since she did not authorize Ersan Ticaret to convey the yacht to anyone.[10]

On August 26, 1992, Ersan Resources made a motion to add Dundar as a defendant in the case based on a letter defense counsel wrote to plaintiff's counsel stating that "Zita King Kiratli was merely the 'titular owner' of the yacht ERSAN, as a matter of convenience to Dundar Ozey." Motion to Add Dundar Ozey As A Defendant at 1. This motion was granted on August 31, and Ersan Resources accordingly filed an Amended Complaint adding Dundar and alleging the defendants (Zita and Dundar) "attempted through fraud and collusion to deprive the plaintiff of its valuable yacht the "Ersan" by attempting to obtain possession and title of said vessel in Kusadasi, Turkey." Amended Complaint at 1. Ersan Resources asks this Court to 1) declare it the lawful owner of the ERSAN; 2) grant judgment against the defendants for their fraudulent attempts to deprive the plaintiff of its vessel; 3) award compensatory damages of at least $50,000, punitive damages in the amount of $250,000, attorney fees, costs and prejudgment interest against the defendants for their fraudulent attempts to deprive the plaintiff of its title to and possession of the ERSAN; and 4) grant a permanent injunction against the defendants prohibiting them from interfering with the plaintiff's title and possession of the ERSAN.

In their Answer, dated September 16, 1992, to the Amended Complaint, Zita and Dundar assume many contradictory positions, as they did throughout the trial. They deny that Dundar was acting under his power of attorney from Zita when he purportedly sold the ERSAN to Orada; however, they also admit that Dundar sold the ERSAN to Orada and later traded the ERSAN V for it. Defendants further assert that ERSAN's title was transferred to Ersan Resources at that time merely for U.S. documentation purposes. Since Dundar paid the purchase price of both the ERSAN V and the ERSAN from funds in his personal account, he claims he is the equitable owner of the ERSAN, Zita is merely the "titular owner" of the yacht and thus he should be awarded possession.

On September 22, 1992, Dundar filed a Third–Party Complaint against Erhan realleging that he, Dundar, is the equitable owner of the ERSAN and that neither Zita nor Ersan Resources have any financial interest in the vessel. Dundar admits that Ersan Resources was formed to hold title to the ERSAN V and the ERSAN in order to obtain U.S. documentation and asserts that Erhan's representations to this Court that Ersan Resources is the owner of the ERSAN are based on "misrepresentation[s] of facts, fraud and deceit." Dundar asks this Court to enjoin Erhan from taking any further actions to gain possession and control of the ERSAN in Turkey, grant Dundar ownership of the vessel plus $100,000 in damages resulting from Erhan's fraudulent attempts to gain possession of the vessel and award him $100,000 in punitive damages for Erhan's alleged misrepresentations of facts, fraud and deceit and conversion of the ERSAN.

On October 6, 1992, this Court granted the injunction and enjoined all parties from seeking a determination of ownership in the Turkish courts. Pursuant to an agreement by the parties, the Court further declared that Ersan Resources and/or Erhan would be responsible for the maintenance of the ERSAN until the final determination of ownership was made at the trial to commence on January 6, 1993.

On October 13, 1992, third-party defendant Erhan answered Dundar's Third–Party Complaint asserting that Ersan Resources was lawfully formed to hold title to the ERSAN V

---

**10.** The power of attorney from Zita to Dundar did give Dundar the right to transfer or convey the ERSAN, and the bill of sale was in fact signed by "Dundar Ozey."

and the ERSAN and that Dundar agreed and benefited from this arrangement until the family problems began in late 1991. Accordingly, Dundar should be estopped from denying Ersan Resources' ownership. On November 27, 1992, defendants requested a continuance of the trial scheduled for January 6, 1993 until the following week since Dundar was not a party at the time the pretrial conference was held. Defendants further alleged that January 6th was not convenient for Dundar. On December 4, 1992, the Court denied defendants' Motion for a Continuance.

## CORPORATE OWNERSHIP OF THE VESSEL

The evidence is clear and the parties do not dispute that Dundar used Zita Kiratli and Ersan Resources to hold legal title to the ERSAN and the ERSAN V in order to obtain U.S. documentation and avoid paying considerable Turkish taxes.[11] The issues which are thus before the Court are whether Dundar is estopped from denying the corporate ownership of the vessels or whether Dundar obtained equitable ownership of them through Ersan Resources' corporate organization.

U.S. registration with the Coast Guard is voluntary for vessels that do not operate in the waters of the United States. 46 C.F.R. § 67.01–7 (1991). To be documented, a vessel must be of at least five tons and wholly owned by U.S. citizens. 46 U.S.C. § 12102 (1992); 46 C.F.R. §§ 67.01–7, 67.01–9 (1991). An individual citizen may register the vessel. A corporation may do so as well if:

(1) It is incorporated under the laws of the United States or of a State;

(2) Its president and, if the president is not the chief executive officer, its chief executive officer, by whatever title, is a citizen;

(3) Its chairman of the board of directors is a citizen; and

(4) No more of its directors are noncitizen than a minority of the number necessary to constitute a quorum.

46 C.F.R. § 67.03–9 (1991). Additionally, at least 75% of the corporation's stock issued must be owned by U.S. citizens. There is a $500/day civil penalty for the violation of the documentation requirements, 46 U.S.C. § 12122(a) (1992), and a criminal penalty of up to $10,000 in fines and/or up to five years imprisonment for knowingly and willingly making false statements of material fact to an agency of the United States. 18 U.S.C. § 1001 (1976).

The application for documentation unambiguously sets forth the U.S. citizenship requirement. For example, an individual must certify that "all owners of [the] vessel are citizens of the U.S.," and a corporate applicant must state its state of incorporation, citizenship of its Chief Executive Officer and Chairman of the Board, the number of directors necessary to constitute a quorum and the percentage of stock owned by U.S. citizens. Certificate of Documentation at Ex. 2 & 3. Moreover, the applicant must attest to the truthfulness of the facts given in the application, that he/she is a U.S. citizen and that he/she is "legally authorized to execute [the] application in the capacity [in which it is signed]." *Id.*

In this case Dundar influenced, induced and directed others to execute documents and file them with an agency of the U.S. government stating that the ERSAN was first owned by Zita and then by Ersan Resources and that the ERSAN V was owned by Ersan Resources. Defendants are correct in that although not conclusive, a certificate of documentation is prima facie evidence of ownership. 46 U.S.C. § 12104 (1992). The underlying sale of the vessel is also indicative of ownership. *In re Banner Yachts, Inc.,* 144 B.R. 985 (Bkrtcy.N.D.Ohio 1992); *Chase Manhattan Fin. Servs., Inc. v. McMillian,* 896 F.2d 452 (10th Cir.1990); *St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co., Inc.,* 666 F.2d 932 (5th Cir.1982); *Meacham Corp. v. United States,* 207 F.2d 535

---

11. Both Dundar and Zita testified to this at trial and admit this in their pleadings. There is also evidence and the Court finds as fact that the U.S. registry facilitated travel in and out of ports in the area where Dundar used the two vessels.

(4th Cir.1953), *cert. dismd.*, 348 U.S. 801, 75 S.Ct. 17, 99 L.Ed. 633 (1954); *ITT Indus. Credit Co. v. M/V Richard C.*, 617 F.Supp. 761 (E.D.La.1985).

In this case, the certificate of documentation along with the evidence that the bill of sale for the ERSAN was made to Ersan Resources,[12] Dundar used the corporate form for his benefit, and the clear language of the statute and application forms necessitate holding Dundar to his placement of ownership of the yachts in the corporation. He used this format to his advantage and cannot now come to this Court denying the corporate ownership. To hold otherwise would make a mockery of the law. Any alien could own a U.S. documented vessel by use of a strawperson who would hold a meaningless title. Surely this could not have been Congress' intent.

Dundar next argues that despite the corporate ownership of the ERSAN, he is its "equitable owner" as he paid for the yacht from his personal accounts and paid for all its upkeep and expenses as well. This argument must also fail for three reasons. First, neither the statute nor the applicable federal regulations mention a distinction between legal or equitable ownership. During the notice and comment period of the statute it was noted that the plain meaning of the statute should guide its implementation. *See* 54 Fed.Reg. 41,992 (1989) (to be codified at 46 C.F.R. § 67). Only the word "owner" is used in the statute, *see e.g.* 46 U.S.C. §§ 12102, 12103, 12122 (1992); more importantly, "wholly owned" is used in the regulations. *See e.g.*, 46 C.F.R. §§ 67.01–9, 67.03–1 (1991).

Second, basic corporation law provides that a contribution to capital becomes the property of the corporation and not of the contributing stockholder. *See United States v. Wallach*, 935 F.2d 445 (2nd Cir.1991) (shareholders do not hold title to the corporation's property); *In re Cash Currency Exchange, Inc.*, 52 B.R. 577 (Bkrtcy.N.D.Ill.1985) ("ownership of corporate property vests in the corporation"). Only when the contributing

stockholder specifies in writing that the property contributed is merely a loan and thus not the corporation's property is the stockholder entitled to the equity in the contributed property. *In re Argo Communications Corp.*, 134 B.R. 776 (Bkrtcy.S.D.N.Y. 1991) (a repayment schedule or demand is required for stockholder to retain interest in the contributed capital); *In re B & L Laboratories, Inc.*, 62 B.R. 494 (Bkrtcy.M.D.Tenn. 1986) (loan to corporation is actually a contribution to capital where there is no evidence that the shareholder has "unconditional right to demand repayment evidenced by a formal written instrument").

There is no evidence of such an arrangement here. In fact, when Dundar transferred the ERSAN V to Ersan Resources, he conveyed "*all* right, title and interest in and to a motor yacht at a book value to be later determined." Ex. 4 (emphasis added). There is no indication of Dundar retaining any equitable ownership, and the use of "all" indicates it was not implicitly agreed to either. When the ERSAN V was replaced by the ERSAN in corporate ownership, it is only logical that Ersan Resources received all rights to the ERSAN as well.

Third, in asserting equitable ownership to the ERSAN, Dundar comes to this Court with unclean hands. If he intended to retain ownership of the ERSAN, this implies he had his agents, Zita and Margaret, falsely file documents on his behalf in violation of the laws of the United States. He may not now be heard to profit by his criminal conduct by saying to the contrary. *Terry v. Yancey*, 344 F.2d 789 (4th Cir.1965) ("where an individual creates a corporation as a means of carrying out his business purposes he may not ignore the existence of the corporation in order to avoid its disadvantages"); *cf. Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804 (Fed Cir.1990) (Withholding information from a patent and trademark office during the prosecution of an application may so soil the patent applicant's hands as to render all patents in the suit unenforceable); *Callanan Road Improve-*

---

**12.** The Builder's Certification for the ERSAN indicates the vessel was built for Carolina Hatteras, Inc., and the Bill of Sale indicates that Carolina Hatteras, Inc. transferred the vessel to Ersan Resources, Inc.

*ment Co. v. United States,* 345 U.S. 507, 73 S.Ct. 803, 97 L.Ed. 1206 (1953) (an appellant cannot take a contrary position to that invoked to obtain benefits earlier); *Admiral Towing Co. v. Woolen,* 290 F.2d 641 (9th Cir.1961) (same); *MedX, Inc. v. Ranger,* 788 F.Supp. 288 (E.D.La.1992) (Equity will not protect one who enters into a contract with the intention of breaking it).

Dundar lastly claims Erhan defrauded Margaret out of her 80% stock in Ersan Resources. He asserts that Erhan must be bound by an alleged statement Erhan made to Margaret informing her that the corporation had no assets because Dundar really owned the ERSAN, the company's only asset. Margaret and her divorce lawyer testified to such statement being made during a property settlement conference; Erhan and his divorce lawyer assert that no such statement was made.

The Court finds the testimony of Erhan and his lawyer to be more credible. Margaret's lawyer, who had trouble remembering her own office address, could not remember whether the alleged statement was made during a break in negotiations or at the end of negotiations. The evidence established that Margaret had five years experience as a manager of a chiropractic practice and was actively involved with her wealthy father and sister in several business enterprises. Further her father was present at the conference at which the alleged "no value" statement was made. Certainly Margaret and her father were experienced enough business people to make their own judgment about the ownership of the ERSAN. Moreover, Margaret agreed to making the property settlement agreement which transferred her stock in Ersan Resources to Erhan as part of the divorce decree, and there is no evidence that she has tried to have that decree set aside for fraud or any other reason.

Even if Erhan made the statement, it would have been made in the context of a negotiation conference where each side was "posturing"; such a statement could not be considered as a serious and legally binding commitment. In any event, Margaret, as president and chairman of the board of Er-

san Resources, cannot claim she was in the dark when it came to matters concerning corporate assets. For the foregoing reasons the Court FINDS that Erhan Ozey did not make any legally or factually significant statement to Margaret Ozey acknowledging Dundar Ozey's ownership of the ERSAN.

### CONCLUSION

The Court FINDS that Ersan Resources, Inc. is the lawful owner of the ERSAN and that Erhan Ozey is its sole stockholder and President. Defendants Zita King Kiratli and Dundar Ozey are permanently enjoined from interfering with Ersan Resources' right to ownership and possession of the ERSAN. Accordingly, the U.S. Coast Guard in Norfolk, Virginia is ORDERED to cancel the documentation of the ERSAN. The Court approves and ratifies the St. Louis, Missouri Coast Guard's documentation of the ERSAN in the name of Ersan Resources, Inc. The Court declines to award Erhan Ozey $7,216.55 in compensatory damages ($2,800 for air fare costs to Erhan Ozey and $4,416.55 for legal fees incurred in Turkey) as these costs were incurred in furtherance of the determination of ownership of the ERSAN, and no authority has been cited to cause this Court to depart from the American rule that each party pays his own preparation and trial costs except the taxable court costs imposed by the clerk.

The clerk is DIRECTED to send a copy of this Order to all counsel of record and to the U.S. Coast Guard in Norfolk, Virginia and in St. Louis, Missouri. The Coast Guard copies shall be certified.

IT IS SO ORDERED.

Norfolk, Virginia

January 15, 1993